Harrison Vick v. The State.

No. 2043.   Decided April 2, 1913.

Rehearing denied June 18, 1913.

**1.—Murder—Murder in Second Degree—Sufficiency of the Evidence.**

Whether the evidence is sufficient to sustain a verdict is a question of law, but this court does not pass upon the weight of the evidence or its credibility; these are questions for the jury, and where the evidence was sufficient to sustain the verdict, the conviction will be sustained.

**2.—Same—Requested Charges—General Objections.**

Where no error is pointed out to the refusal of the court to submit special requested charges, but simply a general objection that they were refused, by number, the same can not be considered on appeal; yet, when considered, there was no reversible error. Following Byrd v. State, recently decided.

**3.—Same—Charge as a Whole.**

Where, upon appeal from a conviction of murder in the second degree, the court's charge when considered as a whole, was correct, there was no reversible error.

**4.—Same—Accidental Killing—Charge of Court.**

Where, upon trial of murder in the second degree, the court gave a full and fair charge upon the question of accidental killing, a complaint that the court erred in failing to charge affirmatively on this issue is not well taken, and besides, is too general.

**5.—Same—Charge of Court—Intent to Kill.**

Where, upon trial of murder in the second degree, the court, in his charge, specifically submitted the issue of intent to kill, there was no error in appellant's complaint that he did not do so.

**6.—Same—Charge of Court—Reasonable Doubt.**

Where, upon trial of murder in the second degree, the court submitted that offense together with manslaughter, negligent homicide of the first degree, accidental killing, reasonable doubt and reasonable doubt between different degrees, in a full and accurate charge, there was no error.

**7.—Same—Argument of Counsel—Bills of Exception—Evidence.**

In the absence of bills of exception, complaints to the argument of counsel, and the admission of testimony, can not be considered on appeal.

**8.—Same—Misconduct of Jury—Jury and Jury Law—Bills of Exception.**

In the absence of bills of exception, qualifications of jurors and the misconduct of the jury can not be considered on appeal; besides, a statement of facts heard on motion for new trial on the ground of the misconduct of the jury can not be considered where the same was not filed before the court adjourned. Following Knight v. State, 64 Texas Crim. Rep., 541, and other cases.

**9.—Same—Evidence—Former Conviction—Other Offenses.**

Where it was made known to the court not in the hearing of the jury that defendant's former conviction of another crime was too remote to be admitted in evidence, the court should not have allowed counsel for the State to interrogate defendant upon this question; however, as the error was harmless, there was no reversible error. Davidson, Presiding Judge, dissenting.

**10.—Same—Former Conviction—Remoteness of Conviction.**

See opinion for a discussion as to when a former conviction of other crimes is too remote to be admitted in evidence.

**11.—Same—Former Conviction—Bill of Exceptions.**

Where it was shown by defendant's bill of exceptions, as qualified by the court that in hearing the testimony of the jurors on the motion for new trial, it was shown that the matter of former conviction of defendant of other crimes had no effect on them and they did not, at the time of the trial, know that defendant had been convicted, and there was no showing that he had been prejudiced by this testimony, there was no reversible error. Following Roberts v. State, 48 Texas Crim. Rep., 210, and other cases.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Williams & Williams* and *W. S. Eason,* for appellant.—On question of insufficiency of the evidence: Mitchell v. State, 28 S. W. Rep., 475; Johnson v. State, 37 S. W. Rep., 424; Wilson v. State, 53 Texas Crim. Rep., 556, 100 S. W. Rep., 153; Brooks v. State, 56 Texas Crim. Rep., 513, 120 S. W. Rep., 878; Johnson v. State, 52 Texas Crim. Rep., 510, 107 S. W. Rep., 845; Tollett v. State, 44 Texas, 95; Elizabeth v. State, 27 id., 330.

On question of objections to the court's charge and refused requested charges: Williams v. State, 24 Texas Crim. App., 342.

On question of court's duty to submit defensive theory: Wheeler v. State, 56 Texas Crim. Rep., 547, 121 S. W. Rep., 166; Pickrell v. State, 60 Texas Crim. Rep., 572, 132 S. W. Rep., 940.

On question of remoteness of former conviction: Davis v. State, 52 Texas Crim. Rep., 629; Winn v. State, 54 id., 538.

*C. E. Lane,* Assistant Attorney-General, for the State.—Cited cases in opinion.

PRENDERGAST, JUDGE.—On March 8, 1912, the grand jury of McLennan indicted appellant, charging that he unlawfully and with his implied malice killed and murdered E. M. Huckelberry by shooting him with a gun on January 3, 1912. The indictment charged only murder in the second degree. He was convicted for murder in the second degree and his penalty fixed at ten years in the penitentiary.

Appellant's main contention seems to be that the evidence is insufficient to sustain the verdict. This point is pressed with much earnestness and vigor by appellant's able attorneys. Whenever it is necessary for this court to pass upon that question in any case it is only necessary to determine from the evidence whether it is sufficient,—not that there may have been ample evidence to have authorized an acquittal. Whether the evidence is sufficient to sustain a verdict is a question of law which this court can and does pass upon. This court does not pass upon the weight of the evidence, nor its credibility. Those questions are alone for the jury. So in this case, we have considered the evidence from the standpoint of whether or not, if believed by the jury, it was sufficient to sustain the verdict. The statement of facts is voluminous. Yet, we have carefully gone over it again and again and considered it thoroughly. It is our opinion that the evidence was amply sufficient to sustain the verdict. We will not undertake to give the evidence in full. It is unnecessary. We will give a summary of some of it on the material points without undertaking to quote it, except in some instances.

For some three years or more appellant had owned, or controlled, and with his wife, they having no children, lived upon a farm in McLennan County some mile or two west or southwest from the City of Waco. One of the public roads from the City of Waco ran along one of the sides of this farm. Through the farm a branch or ravine ran about 450 yards from appellant's house, on which branch there were at different locations, some trees, undergrowth, briars, etc.,—in one place there was considerable of this. So much so that from some places in it a person could not see appellant's barn at his house and could not be seen therefrom in said thicket. There were different paths running through this thicket and from certain points along the path a person could see appellant's barn and a person therein and there-along could be seen from appellant's barn. January 3, 1912, was a real cold, though quite bright, sunshiny day. On the morning of said day the deceased, Huckelberry, and his friend, Horsfield, procured double-barrel shotguns and a buggy and went hunting for birds a few miles west of Waco. After hunting in localities west of appellant's farm until just at noon or just prior to noon of that day, they started back towards Waco along the public road and when they reached said branch they saw birds in appellant's field about or around said thicket, and they hitched their horse and went over into appellant's field near this thicket for the purpose of hunting and killing birds. From where these parties entered appellant's field and for some distance until they reached a thicket therein they were in plain and open view from appellant's house and barn. The distance

was about 450 yards. As soon as they entered appellant's field with their guns, he, being out at his barn, saw them and holloed to them to get off of the place. Horsfield testified that he heard very distinctly a man's voice say, "Well, you fellows get to hell off of there"; that when he heard that he called to Huckelberry to "come on and let's get off of here" Huckelberry replied, "To the dickens with that fellow; I am going to get one more shot at these birds," and Huckelberry continued from where he then was on into the thicket on said branch. Horsfield immediately started back and went out of appellant's field.

Appellant with some two or three other men, on said day and at said particular time, just before or just at 12 o'clock, was working on his barn. E H. Meir was one of these. He testified that appellant holloed a couple of times before he got his gun, saying: "He first holloed at them, you know; yelled, and then he says, 'You had better get out of here.'" Again, he testified: "I did not look to see where the parties were when he first said to get out. I am not sure how long it was from that time until he actually shot. I should judge it to be about five minutes. I think Mr. Vick holloed about twice, and then he went to the house and came back with a gun, and he stood there. When he holloed again, he says, 'I will give them time to get out,' or 'I have to give them time.' Then he just stood there, and finally that fellow on the hill did not make any move and he (appellant) says, 'Well, I will just shoot right through the thicket, and if they hear the bullet through the trees I guess they will go out.' It was after he was with the gun when I first looked to see the parties in the field. That was when I looked."

Again he testified: "When he (appellant) ordered the parties off the place he yelled first right loud, and then he says, 'You had better get out of here.' That is what he said. That is the exact language. That is what I understood." Again he said: "He (appellant) waited a little while after he holloed. He says, 'You had better get out of there.' He says, 'I will give them time to get out; I have to give them time.' He did not take any longer time than I have suggested there."

The testimony, without contradiction, further shows that immediately after appellant holloed, as stated above, he went to his house, got a 44-Winchester rifle, came back out in his lot, placed it up in the fork of a fence post, pointed it over towards this thicket and fired it. E. H. Meir further testified that appellant shot, he judged, right towards the thicket. Appellant himself testified that he thinks he told Meir that he would go to the house, get his gun and shoot over there in the brush; that he could not himself tell where he shot only over in towards the bushes. By actual measurement it was shown to be 449 yards from this forked post where appellant shot this Winchester rifle to the feet of, and about where deceased must have been standing or walking at the time he was killed. It was clearly shown that the deceased was shot with a 44-Winchester ball from the front, near his heart, and that the ball passed entirely through his body, lodging in his outer clothes

on his back, and that the shot produced immediate death. The deceased fell prone, with his head directly towards appellant's barn and his feet directly back therefrom. This Winchester rifle was afterwards experimented with, and shot with the same character of loaded shells that appellant used when he shot, and that it had a carrying distance of perhaps fully 1200 yards. Mr. Forsgard, an expert, shot it, standing at the point where deceased's feet were when he was found dead, at the sheriff's hat stuck up on appellant's barn at about the same height as the shoulder of a man holding a gun, at the place where appellant shot this gun, and the ball struck said barn a short distance beneath this hat and that the ball went through two one-inch planks into the barn and fell therein.

After deceased and Horsfield separated when appellant holloed at them, ordering them out of his field, deceased went into said thicket where his dead body was found that night. Horsfield went out into the public road and where they had hitched their buggy, waiting there for some time for Huckelberry to return, thinking he would return when he got through hunting the birds in appellant's field. However, after waiting several hours, he concluded that deceased might have gone on towards Waco through appellant's field, caught the street car, which was not a great distance therefrom, and gone on home; and after waiting this length of time, Horsfield went back to Waco to his home. He there began to inquire if Huckelberry had returned, but could not find that he had. Still thinking he would turn up in Waco, he waited till along about night, then called and told the officers and others of his alarm about Huckelberry, not knowing whether he had gotten lost or been killed. When he did not turn up some of the officers and friends of deceased, after being told the circumstances by Horsfield, went out to hunt for Huckelberry. They first went to appellant's house, reached there about or just after 8 o'clock that night; appellant and his wife had retired and were in bed. The officers had some little difficulty in getting appellant aroused. When they did, they told appellant they were out hunting for what they supposed to be a lost man, and that the last seen of him he was on his (appellant's) farm down near or at this thicket, and asked permission of appellant to go down into his field in this thicket for the purpose of hunting for Huckelberry. Appellant offered, or wanted to go along. The officers declined to let him go. After getting this permission the officers and party drove their buggy down towards this thicket, but not to it, tied their horse to the fence and went down into this thicket hunting for Huckelberry. They then separated, the officer going in one, and the friend in another direction. Very soon the officer found the dead body of Huckelberry in this thicket, lying on his stomach and at once called his friend, and they saw that he had been shot and killed. Deceased had his double-barrel shotgun with him. The officer at once examined the gun, thinking perhaps the deceased had accidentally shot and killed himself. But upon examination found that both barrels of the gun were loaded and that his body had

not been shot with a shotgun, but with a rifle ball. They at once started back towards appellant's, and immediately after getting out of this thicket met appellant coming directly from his house to where they had found the body of the deceased. When they told him that they had found the dead body, appellant wanted to go down with them and see it, but they declined to permit him to do this, and told him to go back to his house and remain there; that he could be of material service to them in the matter and that they would go to the nearest 'phone and 'phone for the justice of the peace and for an undertaker to convey the body back to Waco. Appellant replied, "All right, I will be here when you get back; I have done carried my wife away anyhow, and I will be right here when you get back." This officer further testified that while they were gone down from appellant's house to this thicket where they found this dead body, and that before they returned to appellant's house, and as they met him, as stated above, he going down there and they declining to go back with him and insisting that he go back with them to his house, he told them that he had carried his wife away from his house and had taken her to one of his neighbor's who lived only a few hundred yards from him towards Waco, and the officer was positive that appellant so told him at this time and not at a later time. It was further shown that when the officer, Hatch, and the party who was with him first went to appellant's house and aroused him, they told him that they came out to hunt on his premises for a lost man and then asked him if he had seen anybody around on his place hunting that day. Appellant said: "Yes, they are just worrying the life out of me out here; there were some out here this very day hunting." That his wife spoke up and said, "Yes, they are worrying the life out of me." Appellant then said, "Yes, they shot some of my stock in the eye," or something. He says, "We are getting awful tired of these people hunting on my place here, and I am going to put a stop to it."

Clyde Billingsley testified that on Christmas day of 1911, which was only some week or ten days before deceased was killed, that he and a boy friend, Willie Hood, were out in appellant's field about this same thicket with their guns shooting at wheat birds, robbins and things like that; that appellant saw them and holloed at them to get out of there; that they did not at first understand and went on. He then holloed and said, "I said get out of there," and Willie Hood said, "Well, give us time," and appellant replied, "I will see if you don't," and was using profane language directed to them; that appellant then started and ran back to his house, got his gun and ran down towards them and shot directly at them with his gun; that he came very near hitting them, the bullet passing right over their heads and very close to them. They were then walking along talking, going out of his field, and when he shot at them they both ran as rapidly as they could and got out. Willie Hood testified substantially the same thing.

C. T. McCoy and W. W. Bell, both barbers living in Waco, testified that on Thanksgiving day, which would be the last of November, 1911,

some five or six weeks before deceased was killed, that they went hunting with their dogs and guns and as they were passing along this road beside appellant's farm they saw some birds down towards this thicket and their dogs flushed a covey of partridges; that they thereupon got out, went over in appellant's field towards this thicket and near to it for the purpose of shooting these partridges and other birds which they saw there. That appellant saw them and came down toward them running and cursing and holloeing, "Get out of here; you can't hunt in here, get out of here." And said, "You all get to hell out of here," and he cursed them and as soon as he got near enough to them they told him they were going out if he didn't want them in there, and he said: "Well, God damn you, I mean it, too." He then turned around, ran to his house, got his gun, came running back towards them and when he got out in his yard he leveled his gun at them and fired.

It was shown that Mr. Williams, an old man, the uncle of Mrs. Vick, wife of appellant, lived about 200 yards from appellant towards Waco and that at that time he took his meals with them; that appellant had at his house said Winchester rifle, which belonged to said Williams, and had had it there continuously from some time in February, 1911, until the night of the day that deceased was killed; that as soon as the officers first came out and told appellant they were hunting for this lost man and asked him if he had seen him on his premises that day, and got his permission to go down and hunt for him, and as soon as the officers left, Mrs. Vick, appellant's wife, testified that she told her husband that she was not going to stay there by herself and for him to take that "darned old gun home." She claims that this was after the officers had told them that they had found the body of this dead man. The officer, as stated above, swore that when he first went back to appellant's house, just after they found the body of deceased, that appellant not only then told him, but, as a matter of fact, while they were gone down there, he took his wife from his home to one of the neighbors. Appellant himself testified that he went back and when he told his wife the officers had found the dead man and wanted him to stay at his house till they returned with the justice of the peace and undertaker to get the body, that she said she did not want to stay there but wanted to go somewhere, and she said, "I want you to take that old gun away from here." Appellant replied, "There ain't nothing going to bother me." They both then testified that appellant did that night take this Winchester rifle from his house to Mr. Williams', her uncle, and that he that night left it there. The evidence further shows that at no time during this night or at any other time, did appellant tell the officers or any others that he had that Winchester rifle at his house and shot it that day, as shown above, and said nothing to them whatever about it; that they hunted for two or three days for such a rifle and repeatedly went through appellant's house hunting it and could not find it therein, and only found a little 22-target rifle in his house; they tried to find the said Winchester in said Williams' house; that it took them some time

to do so, two or three days, and when they did, they found it. back in the room behind a window facing, and while it was not exactly hidden, that it was so placed that it could not readily be seen and it took some search to find it. Appellant, when pressed on cross-examination, could not give and did not give any satisfactory reason why he did not tell the officers about having that gun and having shot it that day and he did not tell the officers that night or at any other time that he had taken that gun from his residence back to his uncle's.

There was much experimenting by many of the witnesses as to whether or not a person standing where the feet of the deceased were when they found his dead body could be seen by a man standing at the post at the barn from which appellant fired said Winchester. And vice versa, whether a man standing at this post could see a person standing where the feet of deceased were, where his body was found. Some of the witnesses testified that they did not see, and could not see appellant's barn, nor a man at said post standing where the feet of the deceased were found, and vice versa, that standing at said post they could not see a person standing at a point where deceased's feet were when found. Some witnesses, however, for the State testified that they could see said barn from where deceased's feet were found and some that they could stand at the post where said barn was and see a person standing at the feet of deceased, or a point two feet south therefrom. In other words, the testimony was sufficient to show that deceased could have been seen by appellant at the time he fired said shot. Appellant claimed on this point that a hill on said branch was a physical obstruction so that persons standing at the two respective points could not see or be seen by one another. The State introduced a civil engineer who had made an accurate topographical survey and he showed that this hill did not obstruct this view. In addition, as stated above, Forsgard actually stood at the point where the feet of the deceased were found, and shot the same rifle that appellant shot at the hat of the sheriff stuck up on the end of said barn at about the same height that appellant must have had the gun when he shot it, and that he missed the hat only a few inches and struck the barn below the hat. These physical demonstrations showed without question that a ball fired from the Winchester rifle towards said thicket by appellant could have and in all probability did strike deceased and killed him. All of this was for the jury. The evidence on this point was amply sufficient to sustain a finding either way. Taking the whole testimony on this point, we think the evidence establishes, without doubt, that the ball fired from this Winchester rifle by appellant struck and instantly killed deceased. The evidence did not justify any other finding and there is no evidence tending to establish that any other shot, or person, killed the deceased. It is unnecessary to further state the evidence.

The first eleven grounds of appellant's motion for new trial, and his bills of exceptions on that subject, complain of the refusal of the court to give his said eleven special charges. These grounds of the motion,

under the uniform holding of this court, are too general to require the court to consider them. As a sample of them we give the first. It is: "The court erred in refusing defendant's special charge No. 1, which is as follows:" Then quotes the charge and no more. It is true that after the adjournment of the court appellant prepared, the court allowed and was then filed, a bill of exception to the refusal of the court to give this, as each of said other special charges. In that bill thus made and filed, after the adjournment of the court, appellant undertakes to give the reasons why he asked such a charge. But none of this is stated in the motion for new trial or otherwise in the record, during the term of court. That such grounds of the motion are too general, under the holding of this court, to require this court to review them is without question. It is unnecessary to cite all of the cases on this point, but see Byrd v. State, 151 S. W. Rep., 1068, and authorities there cited. Notwithstanding these assignments are entirely too general to require this court to review them, yet, we have carefully examined each of them, and, in our opinion, the court properly refused to give any of them. Wherever the question attempted to be submitted by any of these special charges was necessary or proper to be submitted, it was correctly, fully and aptly submitted in the charge of the court.

In the twelfth to sixteenth, inclusive, of the grounds of the motion for a new trial are complaints of some word or short paragraph of the court's charge. We have carefully considered each of these. It is unnecessary to take them up separately. In our opinion none of them show any reversible error whatever or any defect, in fact, in the court's charge complained of, when the charge' as a whole is taken together, which is necessary to be done.

The seventeenth paragraph is: "The court erred in failing to charge affirmatively on the issue of accidental killing, this being one of the main defenses." This is the whole of the complaint. It, too, like all the others of appellant's complaints of the charge of the court, is too general to require this court to review it. However, we have considered every one of them and no reversible error is shown by any. Take this ground as a sample. It will be seen that the complaint is not of the charge that the court did give on accidental killing, but that the court failed to charge affirmatively thereon. The court did give on this subject a full, fair and apt charge. It covered the case and every point of it as made by the evidence. It is as follows:

"You are further charged that no act done by accident is an offense except where there has been a degree of carelessness or negligence which the law regards as criminal, and homicide is excusable when the death of a human being happens by accident, or misfortune, though caused by the acts of another who is in the prosecution of a lawful object by lawful means; and, as heretofore instructed, you are charged that the defendant at the time of the alleged killing had the legal right, with such care and caution as a man of ordinary prudence would exercise under the same or similar circumstances, to fire off his gun for the pur-

pose of frightening the deceased or alarming him to cause him to leave his premises, if he was hunting thereon, or was on there without the defendant's permission, and if you believe from the evidence that on the date of the killing, if the defendant, not knowing the deceased was in the thicket on his premises, shot in that direction for the purpose of alarming the witness Horsfield to make him leave said premises, or if you believe that the defendant knew the deceased was in said thicket, but fired off his gun to alarm him and make him leave said premises, using at the time such care and caution as a man of ordinary prudence would use under like circumstances, then you will acquit him."

Appellant's eighteenth ground is that the court erred in failing to charge affirmatively on the issue of intent to kill, this being one of the main defenses. The charge of the court did submit this issue specifically to the jury and required the jury to believe beyond a reasonable doubt, with all the other requisites, that the appellant must have fired the gun "with the intent to kill," and it also required the jury to believe in like manner that he did unlawfully and with implied malice shoot and thereby kill deceased. It is unnecessary, in our opinion, to take up and review any of the other of appellant's complaints of the charge of the court. We have carefully considered them all and none of them present any reversible error, if even any slight technical error at all.

The court charged on murder in the second degree, manslaughter, negligent homicide of the first degree, accidental killing, reasonable doubt between different degrees, and reasonable doubt. In our opinion it is one of the most complete, apt, full and accurate charges we have had to consider, and, in our opinion, it properly submitted every issue that was authorized or justified by the evidence and was strictly in accordance with and applicable thereto.

Some grounds of the motion for new trial complain of the argument of the county attorney in some particulars, and of his asking some questions about a written statement made by appellant, and of the admission of the testimony of said witnesses Hood and Billingsley, and also of McCoy and Bell, but none of these matters are presented by bill of exception and, of course, not being so presented and verified can not be considered by this court.

In one ground of appellant's motion for new trial he complains that one of the jurors, Edwards, was not a qualified juror; and in another he complains that the jury separated. Neither of these matters is presented by a bill of exception. The record, however, shows that the court on these two grounds of appellant's motion heard the testimony of many witnesses. This evidence embraces forty-three typewritten pages and shows that many witnesses were examined and testified, among them all but one of the jurors, and that the court, after hearing all this testimony overruled appellant's motion on those two grounds as well as all the others. This case was tried at the term of the District Court of McLennan County, which convened on March 4, 1912, and adjourned on May 15, 1912. The motion for new trial was overruled on May

12th, and notice of appeal then and there given. Said statement of the testimony on said two grounds of appellant's motion is entirely separate and distinct from the statement of facts on the trial of the cause, and it was not filed in the lower court until July 11, 1912, sixty days after the overruling of the motion for new trial, and fifty-seven days after the adjournment of the court. It has always been held by this court in a uniform line of decisions that a statement of facts on such collateral matters, as presented by these two grounds of the motion, must be filed before the court adjourns; otherwise, this court can not consider them. See Knight v. State, 64 Texas Crim. Rep., 541, 144 S. W. Rep., 967; Probest v. State, 60 Texas Crim. Rep., 608, and the authorities cited in those cases. This court, therefore, can not consider this statement of facts on said two grounds of said motion and without a statement of facts, it clearly appearing that the court heard testimony, we must conclude as the law requires, that the court correctly overruled the motion on said grounds.

There is but one other question necessary for us to review and decide, and that is, whether or not the acts and conduct of the county attorney and presiding judge in permitting the questions which were asked of appellant when he was on the stand about a former conviction for horse theft, for the purpose of effecting his credibility. This is shown by appellant's bill of exception, which shows that after the conclusion of his direct examination as a witness in his own behalf, appellant's attorneys approached the court's desk and upon their invitation the county attorney joined them; that out of the hearing of the jury his attorneys informed the judge that he had been convicted of horse theft in that court more than thirteen years prior to that time and while he was a boy, and that he had been fully pardoned, exhibiting his pardon papers to the court, and claimed that his said former conviction was not admissible against him because it was too remote and was when he was a boy and because of said pardon; that the court then stated he thought the former conviction was too remote and not proper to go to the jury. His attorneys then asked the county attorney if he would observe said ruling of the court and not attempt to elicit said information before the jury. The county attorney replied that he would not but that he would inquire into said conviction. Thereupon his attorneys moved the court to instruct the county attorney not to ask questions to elicit such information and prohibit him from doing so. The court stated that he knew of no rule of law authorizing him to so instruct the county attorney, and overruled his motion, to which he excepted. That all of this occurred out of the hearing of the jury; that afterwards and while appellant was testifying on cross-examination, the county attorney, over his objections, asked him in the presence of the jury if it was not a fact that he had been convicted for horse theft in that court, his grounds of objection being as above stated, and that it was highly prejudicial to his case. The court at the time made no ruling. Before the question was answered and the court ruled, the county attorney asked the

deputy clerk of the court to bring the minute book showing his conviction, to which appellant objected because it was improper, prejudicial and too remote and still the court made no ruling.  After the clerk brought said minute book into the court-room and in the presence of the jury the book was passed to the judge, and after reading it to himself, he stated that the defendant's objections to the effect that said conviction was too remote, were well taken and he sustained it, and would not permit said book in evidence and would not require appellant to answer.  The court thereupon instructed the jury not to consider what had just occurred in their presence.  We have given above the substance in full of said bill.  The court, in allowing it, qualified it by stating, "The testimony of the jurors on the motion for new trial shows that this matter had no effect on them and they did not at the time of the trial know defendant had been to the pen."  This bill as thus qualified was accepted and filed by appellant and is the only bill presenting the matter to this court for a review.

This court has never held in any case we have been able to find, after the most diligent search, that the previous conviction for a felony of an appellant, when he makes himself a witness, or any other witness, can not be proven when such conviction was had thirteen or less years theretofore.  It has been many times, and in many cases, held that when a conviction has been for a great number of years that it is too remote and should not be admitted, and if admitted, and it is of such great age, it should cause a reversal.  We are not undertaking to review all the cases, but will cite some of the most recent ones and all that we have been able to find directly in point.  In the case of Bowers v. State, 71 S. W. Rep., 284, this court first held, that a conviction occurring eighteen years before the trial was admissible for the purpose of effecting the credibility of the witness, stating: "The lapse of time since the commission of the crime could not be an objection to the admissibility of the testimony but might go to its weight."  However, on rehearing in that case, it was held that fifteen or seventeen years was too remote and that evidence of such conviction was not admissible.  In Dyer v. State, 77 S. W. Rep., 456; Ware v. State, 49 Texas Crim. Rep., 413; Winn v. State, 54 Texas Crim. Rep., 538, and Hanks v. State, 55 Texas Crim. Rep., 451, twenty years in each case was held too remote.  In Wesley v. State, 85 S. W. Rep., 802, twenty-five years was held too remote.  In White v. State, 57 Texas Crim. Rep., 196, twenty-four years was held too remote.  In Brown v. State, 56 Texas Crim. Rep., 389, and Bogus v. State, 55 Texas Crim. Rep., 126, and White v. State, 57 Texas Crim. Rep., 196, fifteen years was held too remote.  Also in the Winn case, supra, in addition to holding that twenty-one or twenty years, it also held that fourteen years was too remote.  But in the recent case of Oats v. State, 67 Texas Crim. Rep., 488, 149 S. W. Rep., 1194, this court held that nineteen years and twelve years in that case was not too remote under the circumstances of that case.  So that, as stated above, we know of no decision in this State which has held that thirteen years

without anything else and without the circumstances being stated or shown is of itself too remote. The true rule is stated in the Winn and Oats cases, supra, to this effect: "Testimony of this character after a long lapse of years should not have been introduced where there was nothing in the record to show that defendant has not reformed. In other words, the law will not permit the early indiscretions of a witness to be brought into requisition to besmirch and becloud his subsequent life. To do so, as expressed by Judge Greenleaf, would be to preclude any possible chance of a reform and would enable State's counsel to parade the early misdeeds of a subsequently useful life to be introduced to becloud and discredit the subsequently honorable and useful life." So that while this court has never heretofore held in any case that thirteen years in and of itself was too remote, yet, applying the principle heretofore announced to the facts of this case, and this bill showing that this former conviction of the appellant occurred while he was a boy, as the record shows about eighteen years old, and there being nothing in this record or bill to show that appellant had not reformed, and especially as he had been pardoned, the court below correctly held that his former conviction was inadmissible to affect his credibility.

But the court was clearly in error when he stated in effect there was no rule of law giving him authority to require or instruct the county attorney not to ask appellant about the former conviction. The court not only had the power and authority to do so but it was without doubt his duty to do so, and not only should he have instructed and required the county attorney not to ask said questions, but he should have used the whole power of the court to enforce his instructions. And if under such circumstances the county attorney still persisted and asked or attempted to ask such question, the court should have inflicted such immediate and severe punishment as would not only deter him, but any other prosecuting officer in future to desist. Appellants, however guilty, or for whatever crime charged, have the right to a fair and impartial trial and they have the right and it is the duty of the court and the prosecuting officers to see that improper evidence is not admitted or attempted to be introduced.

In the case of Sweeney v. State, 65 Texas Crim. Rep., 593, 146 S. W. Rep., 883, we recently reviewed this question and cited authorities to the effect that the asking of improper questions to elicit improper evidence alone, was not sufficient ordinarily to require this court on that account to reverse a case. Such questions might, in some cases, require a reversal. In this, however, we are of the opinion that it is not sufficient to authorize or require this court to reverse this case. As stated above, this court had never before held that evidence of former conviction occurring thirteen years before was not admissible for the purpose of impeaching a witness or the appellant himself. In addition, as shown by the bill, the court at last sustained appellant's objections to said testimony. Also he specifically then and there, as shown by the bill, instructed the jury not to consider what had occurred thereabouts

in their presence. And still in addition, in allowing the bill, qualified it by stating that in hearing the testimony of the jurors on the motion for new trial it was shown that this matter had no effect on them and they did not at the time of the trial know defendant had been convicted. Appellant accepted this bill and filed it, and that is the basis of his complained error now. Besides, appellant in the bill, nor otherwise, shows how or in what way appellant was prejudiced thereby. The mere statement in the bill that it was prejudicial, without stating how or in what way, does not of itself establish any prejudice. In many cases this court has held that where even illegal evidence has been admitted and then withdrawn by the court that no reversible error is committed. Roberts v. State, 48 Texas Crim. Rep., 210; Sutton v. State, 2 Texas Crim. App., 342; Morgan v. State, 31 Texas Crim. Rep., 1; Miller v. State, 31 Texas Crim. Rep., 609; Jones v. State, 33 Texas Crim. Rep., 7; Robinson v. State, 63 S. W. Rep., 869; Trotter v. State, 37 Texas Crim. Rep., 468; Hatcher v. State, 43 Texas Crim. Rep., 237. "Admissions of illegal testimony will not constitute reversible error, unless some injury is shown or reasonably made to appear." Hooper v. State, 29 Texas Crim. App., 614. In our opinion, on the whole on this question, while the action of the county attorney and trial judge was clearly wrong, it is not of sufficient gravity to require this court to reverse. Huggins v. State, 60 Texas Crim. Rep., 214; Sweeney v. State, 65 Texas Crim. Rep., 593, 146 S. W. Rep., 883, and authorities therein cited.

The judgment will be affirmed.

*Affirmed.*

HARPER, JUDGE.—Under the circumstances of this case I am willing to concur in the opinion, but I do not concur in that part of the opinion wherein it is said that this court has never held thirteen years or less would be too remote to show a former conviction. I think the trend of all of our decisions are contrary to that view, and individually I am of the opinion that unless there is other evidence showing a continuity of criminal acts, a conviction had more than seven years prior to the commission of the offense for which he is then on trial would be too remote, and should not be admitted.

DAVIDSON, PRESIDING JUDGE.—The use of prior conviction is for impeachment, and should be and is based upon the idea that the convicted party is or may be corrupt. This must depend upon, to some extent, the subsequent conduct and life of the party. Nothing shown to the contrary the witness would be presumed credible. Unless something shows to the contrary this presumption should not be overturned by a previous conviction of any remote date. This remoteness would depend somewhat upon subsequent conduct. Usually I would be disposed to agree with Judge Harper as to number of years, but I am not prepared to lay down an iron bound rule as to date. I think questions

presented in the bills of exception are sufficiently set forth to require consideration.

[Rehearing denied June 18, 1913.—Reporter.]