J. H. Stinson v. The State.

No. 14381. Delivered March 16, 1932.
Rehearing Denied May 4, 1932.
Application for Leave to File Second Motion for Rehearing Denied May 11, 1932.

The opinion states the case.

*Jas. D. Buster,* of Sherman, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

HAWKINS, JUDGE.—Conviction is for murder, punishment two years in the penitentiary.

The killing occurred on Friday night, June 6, 1930. Deceased was Ray Nelson, a son-in-law of appellant. The Stinson and Nelson families lived about a quarter of a mile apart. On the 22d day of February, 1930, deceased and Grace Stinson, appellant's daughter, ran away and were married in Oklahoma. There seems to have been no particular objection to the marriage except on account of their youth, deceased being seventeen years of age and Grace only fifteen. For a month after the marriage they lived with the mother of deceased, and then moved to Dallas. On Sunday, before the homicide, appellant, his wife, a daughter (Lillian) and Jess Daugherty (whom Lillian subsequently married) went to Dallas to see deceased and his wife, and had dinner with them. This visit seems to have been insisted upon by deceased. It appears that some time before the visitors were to start home deceased asked Grace if she was going with her mother, to which she replied she thought she had better remain in Dallas and work, whereupon deceased, in rough and profane language told her she was going. His manner did not seem to have conveyed to either Grace or her mother any unfriendly attitude towards his wife, but was apparently his way of insisting on her visit to her people, because he had already once or twice visited his people. Grace went home with her mother. She spent Monday night with deceased's mother. On Tuesday deceased and a boy by the name of Pruitt arrived from Dallas. It was understood they were going to the oil fields of West Texas to try and secure work. Deceased's wife was pregnant and on that account preferred that deceased not leave, but it seems to have been understood they were going on Saturday. Pruitt claims to have had a conversation with appellant in which he said that he (Pruitt) could go to West Texas if he wanted to, but that Ray (deceased) was not going, as he could not go away and leave his wife. From the time

deceased reached the neighborhood on Tuesday he and his wife seem to have alternated in staying part of the time at his mother's and part of the time at appellant's. On Friday deceased, his mother and deceased's wife went to Sherman in an automobile; some little disagreement arose between deceased and his wife during that trip, but apparently nothing of a serious nature. Upon their return appellant left his wife at her father's home, and drove his mother on to her home. Mrs. Stinson testified that after their return from Sherman Grace was lying on the bed crying and told witness that Ray had quit her; that when appellant came in from work witness communicated this to him, but that he apparently paid little attention to it treating it rather lightly, and said in substance that lots of folks quit and went back together again. After supper Grace asked Lillian to go to Mrs. Nelson's and get her clothes. Daugherty accompanied her. On the way they were overtaken by deceased in his car, and rode the balance of the way with him. He was present at the time Lillian asked Mrs. Nelson for Grace's clothes, but apparently said nothing. Mrs. Nelson testified that she supposed Ray and Grace were going to spend the night with Grace's mother, and put some of his clothes in the bundle with Grace's. When Lillian and Daugherty started back deceased told them he was going up there and asked them to ride in the car, but they declined, saying they preferred to walk.

Deceased drove on ahead to the Stinson home. There is nothing to account for the conduct attributed to him there, unless he became angered on account of Grace having sent after her clothes. The testimony as to what occurred is practically in agreement on all essentials from appellant, his wife, and deceased's wife. They claim that deceased got out of the car, came up on the porch cursing, saying that he would "Kill the G— d— old son of a b—, and get the girl, too." Mrs. Stinson started to the door and met deceased about the time he jerked the screen door open; she succeeded in keeping him out of the house, but he was repeating, substantially, the same language. Appellant called from within the house where he had gone to bed, asked who it was, and upon being told it was deceased, came to the door and insisted on him going away, telling deceased he did not want to have any trouble with him. Appellant said deceased struck at him over his wife's shoulder and continued to make threats, that he (appellant) stepped back in the house and got his pistol. At this point we quote from appellant's testimony as follows: "He and my wife were still scuffling when I got back out there and I told him to leave. I did not want any trouble with him, and he just reached down like he was going to get a rock and I thought he was going to kill me, and I just shot, thought I would scare him off. At the time I shot I did not intend to take the life of Ray Nelson. I thought I would scare him off and he would go off and leave me alone, and that was the reason I shot."

The testimony of Mrs. Stinson and deceased's wife as to the movements of deceased as though he were picking up a rock, was practically the same as that of appellant. One of appellant's daughters went after the witness Hill. The state proved by him that he reached the Stinson home soon after the killing; that deceased and his wife were then sitting in the car, and appellant was on the porch; upon inquiry from Hill as to what the trouble was, appellant told witness that:

"The boy made fight at me and I had to kill him, or to shoot him."

This same witness went with appellant to Sherman where appellant surrendered to the officers. Hill said that on the way to Sherman appellant told him he had shot the boy but did not think he had hurt him, but said, "I ought to have killed him." Upon further examination by the district attorney he changed this expression and said appellant's language was "he wished he had killed him." Deceased was taken to a hospital at Sherman that night, and died shortly after reaching there.

Bill of exception No. 1 complains because appellant was not permitted upon cross-examination of a state's witness to show "whether or not the screen to the front door of appellant's house was jerked loose from the hinges." According to the qualification to the bill, the evidence sought to be elicited, whatever it may have been, was rejected because it had not been shown that the witness examined the screen at or near the time of the killing, or that the screen, when examined, was in the same condition as at the time of the killing. This qualification seems to have justified the court in excluding the proffered testimony. We observe, however, that the bill fails to inform us what the evidence of the witness would have been. For that reason also it presents no error. Branch's Ann. Tex. P. C., sec. 212; Texas Jurisprudence, vol. 4, sec. 219.

Bill of exception No. 2 reflects the following: State's witness Hill had testified that as he was going to town with appellant he said he had shot deceased but did not think he had hurt him, but that he "ought to have killed him." State's counsel then asked the witness if appellant did not say "he wished he had killed him." Upon objection being interposed state's counsel replied that he only wished to refresh witness' memory. In qualifying the bill the court says appellant's counsel objected to the county attorney refreshing the witness' memory in the presence of the jury, but had no objection to him refreshing the witness' memory somewhere else. We understand from the bill that the county attorney then withdrew the witness from the stand and retired from the court room with him; that upon their return to the court room witness resumed the stand, and the county attorney asked him several questions regarding the matter to which objections were sustained; the court then suggested that witness be asked if he wished to change his testimony upon the point under inquiry. In reply to such question the witness testified that appellant had said, "he *wished* he had killed deceased." We fail to observe

any error reflected by the bill. It is, under some circumstances, much the better practice and much fairer to defendant, for the state to withdraw a witness from the stand to refresh his memory than to undertake to do so in the jury's presence. Spangler v. State, 41 Texas Crim. Rep., 424, 55 S. W., 326. At any rate, the procedure in removing the witness from the stand seems to have been prompted by the suggestion of counsel for appellant.

Bills of exception Nos. 3 and 4 relate to the same subject and may be considered together. Appellant had placed in issue his general reputation as a peaceable, law-abiding citizen by filing an application for suspended sentence and by the testimony of a number of character witnesses. Counsel for appellant anticipated that these character witnesses would be asked by the state upon cross-examination if they had heard about difficulties or trouble appellant had theretofore had with certain named parties at times by counsel for appellant thought too remote. He filed two written motions in which the court was asked to direct counsel for the state not to ask character witnesses if they had heard about such transactions. In qualifying the bill the court says that in response to the motions referred to he verbally instructed the county attorney that when defendant took the stand as a witness not to ask him on cross-examination about any felony charge occurring more than seven years prior to this trial, and that this instruction was observed; he ruled that on cross-examination of defendant's character witnesses who had testified that his reputation was good, that the state might ask if such witnesses during the time they had known him, had heard that he had been engaged in difficulties or had trouble with certain named persons. We think the learned trial judge was correct in his ruling. In the cases of Vick v. State, 71 Texas Crim. Rep., 50, 159 S. W., 50; Bullington v. State, 78 Texas Crim. Rep., 187, 180 S. W., 679; Faulkner v. State, 80 Texas Crim. Rep., 341, 189 S. W., 1077; Couch v. State, 93 Texas Crim. Rep., 27, 245 S. W., 692, 25 A. L. R., 1359, it has been held that where the defendant intends to take the witness stand, and has theretofore been legally charged with or convicted of an offense which is too remote to be inquired about for purposes of impeachment, he may call the same to the court's attention and get a ruling thereon, thereby preventing the question from being asked in the presence of the jury. This rule has not been applied to the cross-examination of character witnesses. The court clearly recognized the distinction.

Bill of exception No. 5 reflects that while counsel for the state was cross-examining Mrs. Grace Nelson, wife of deceased, she was asked whether or not her parents objected to her going with deceased, and treated her mean when she was going with him. The bill fails to reflect that the witness answered either of those questions. Certainly it would have been pertinent to have inquired of the witness whether appellant

objected to her going with deceased prior to the marriage. The bill further recites that witness was asked if she would know her own handwriting, and if whatever she told deceased "in these letters was a fact." Witness replied that she did not know that she had told him anything. She was then asked the following question: "Well, didn't you tell him (meaning her husband) that they treated you like a dog?" The bill does not show that this question was answered. The bill shows that at this point the county attorney showed the witness a letter and asked her if it was in her handwriting and she replied that it was, that she had written the letter. The county attorney then offered the letter in evidence and the court sustained objection thereto. The bill further recites that appellant asked the court to strike from the record any reference to the letter and any answers witness had made relative to it, and instruct the jury not to consider it, but the court declined to do so because the request was not made until after the testimony was in. If any testimony went to the jury as a result of the questions objected to the bill does not reflect what it was. There is a notation in the bill as follows: "(S. F. 93-94)." If it was intended as a part of the bill to refer us to the statement of facts on the pages so indicated it appears therefrom that the witness testified that her parents did not object to her going with deceased, that they did not treat her mean while she was going with him, and that she did not write him any letter and tell him that they did. No error appears from the bill considered either alone or in connection with the statement of facts. What the witness did testify to was favorable to appellant.

Bill of exception No. 6 reflects that on cross-examination of Mrs. Stinson, wife of appellant, it was elicited from her that she found Grace lying on the bed crying after she came home from Sherman, on Friday; that Grace said her husband had quit her, and that she (Mrs. Stinson) told appellant about five o'clock that afternoon. Appellant testified that his wife conveyed this information to him. We can see no error reflected by the bill.

Bill of exception No. 7 reflects that while the county attorney was making the closing argument for the state he said in reference to the defendant: "While you were on the stand if you had not had the difficulty with your son-in-law, why didn't you deny it?" Objection was interposed and the court instructed the jury not to consider the remark of the county attorney. In connection with the same matter the county attorney referred to witness Akers and some other witness as having said they had heard about this difficulty. In each instance objection was based on the ground that no complaint or indictment had been offered showing appellant had ever been charged with an offense growing out of the transaction. The court qualifies the bill by stating that Akers and other character witnesses introduced by appellant to show good reputa-

tion had stated upon cross-examination that they had heard about appellant having a difficulty with a son-in-law in Oklahoma. The bill shows no error.

The state proved by the witness Hill that soon after the witness got to appellant's house on the night of the homicide appellant told him "the boy made fight at him and that he had to kill him, or had to shoot him." Appellant insists that the state having introduced this testimony appellant should be acquitted because, he says, the state failed to show that appellant had not killed deceased in self-defense. The learned trial judge gave appellant a most favorable charge, telling the jury they must view the facts and circumstances as they reasonably appeared to appellant at the time he acted in the difficulty, and that if it reasonably appeared to him at the time that he was in danger of death or serious bodily injury he had a right to act on such appearance of danger, and if it reasonably appeared to him that it was necessary to protect himself against death or serious bodily injury he would be justified in shooting his adversary, though the jury might now believe from all the facts and circumstances that he in fact was in no danger. In addition to the general charge upon self-defense, the court gave a very liberal charge upon self-defense, based upon threats; and finally told the jury if they found and believed from the evidence that deceased came to the home of appellant and raised a disturbance and cursed and abused appellant, or threatened to kill him, that they were instructed that appellant had a right to order deceased off his premises, and upon him refusing to go had a right to use all necessary force to compel deceased to leave his premises, and if they believed appellant did request deceased to leave and deceased did not do so, and thereupon appellant fired his pistol with the intent and purpose to scare deceased off the premises, without any intent to kill him, or injure him in any way, that appellant would be justified in his action and they should find him not guilty, regardless of whether appellant believed he was in danger of death or serious bodily injury at the hands of the deceased or not, or if they had a reasonable doubt as to the matter they should find appellant not guilty.

It is not practical to set out more in detail the evidence than we have already done in this opinion. From the entire facts we think the jury was justified in reaching the conclusion that it did not reasonably appear to appellant at the time the shooting occurred that a necessity existed for him to fire upon deceased to save his own life or himself from serious bodily injury. If by reason of the statements testified to by witness Hill the burden was cast upon the state of disproving the exculpatory statement therein contained, we are inclined to the view that the burden has been discharged under the facts present in the record.

The judgment is affirmed.

*Affirmed.*

ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—In our original opinion we tried to discuss fully each complaint made by appellant in the court below. A review of what we said, in the light of appellant's motion for rehearing, has not convinced us that we erroneously decided any point presented. The case was tried before one of our most careful and experienced district judges, who qualified several of appellant's bills of exception, but in no instance was there exception taken to his action in such matter.

Even if it might be true that the members of this court, sitting as a jury, might have arrived at a different conclusion on the facts, still there being no such lack of testimony to support the verdict, as evidences prejudice on the part of the jury trying the case, whose duty primarily it is to pass on the facts, we cannot set a precedent of setting aside the judgment of the jury and reversing the case and sending it back for a new trial.

Appellant's motion for rehearing makes a strong appeal, but raises no new questions, and calls our attention to no precedent with which our opinion, in the first instance, is not in harmony.

Believing the case properly decided, the appellant's motion for rehearing will be overruled.

*Overruled.*

ON APPLICATION TO FILE SECOND MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—The facts, issues and legal questions were examined and epitomized in the original opinion so far as this court was capable of doing so.

The facts in the case of Reed v. State, 119 Texas Crim. Rep., 459, 46 S. W. (2d) 319, to which the appellant refers, distinguish it from those controlling in the present appeal.

The appellant's misunderstanding of state's counsel before this court is evident. State's counsel in his brief did not concede or intimate that the evidence on the issue of self-defense was conclusive against the state. The state's brief is to the contrary, contending that the issue of self-defense was one for the jury.

In the light of the record, with the remarks hereinabove made, this court feels constrained to decline to consent to the further consideration of the appeal in response to the appellant's second motion for rehearing, leave to file which is denied.

*Denied.*