Joseph Stanley **FAULDER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 60554.

Court of Criminal Appeals of Texas, En Banc.

April 18, 1979.

Rehearing Denied Oct. 3, 1979.

Rehearing Denied Feb. 6, 1980.

Certiorari Denied Oct. 6, 1980.

See 101 S.Ct. 215.

Vernard G. Solomon, Marshall, for appellant.

Odis R. Hill, Dist. Atty., Longview, Robert Huttash, State's Atty., Austin, for the State.

Alvin G. Khoury, Asst. Dist. Atty., Longview, for the State on motion for rehearing.

## OPINION

QUENTIN KEITH, Commissioner.

Appellant was convicted of the offense of capital murder, the indictment having charged that he killed Inez Phillips while in the course of committing or attempting to commit aggravated robbery. At the punishment hearing, the jury answered each of the three questions set out in Article 37.071, V.A.C.C.P. (Supp. 1978–79), in the affirmative, and appellant was sentenced to death.

Although the conviction is assailed by six grounds of error, none directly challenge the sufficiency of the evidence. The body of Inez Phillips, a widow seventy-five years of age, was found on a bed in her home in Gladewater by her maid on the morning of July 9, 1975. Mrs. Phillips was bound and gagged with tape, a large knife was protruding from her upper chest and the back of her skull had been crushed by a blunt instrument.

Mrs. Phillips' home had been ransacked thoroughly and all indications were that robbery had been the aim of her assailant, but no immediate suspect was known to the officers.

Appellant was arrested in the State of Colorado on April 18, 1977, upon a warrant charging theft over two hundred dollars in an unrelated incident alleged to have been committed in Gregg County on July 4, 1975. Appellant waived extradition and was returned to Gregg County on April 20. The next day, Justice of the Peace Charles Cashell advised him of his statutory rights regarding the theft charge as set out in Article 15.17, V.A.C.C.P. (1977), and appellant acknowledged such statutory warning by signing on the front page thereof.

On April 25, 1977, appellant signed a written statement confessing that he killed Mrs. Phillips under circumstances amounting to capital murder. At the trial, and after an extensive *Jackson v. Denno*[1] hearing, the court found the statement to have been voluntarily made and held it to be admissible as a matter of law and fact. Article 38.22, § 6, V.A.C.C.P.

James C. Bailey testified that he owned the Twilight Lounge located on South Green Street in Longview and the Fina Service Station located just across the street from the lounge. In early July, 1975, a person known to him at that time as Stan Cotter was operating the filling station. He identified appellant as the person known to him as Cotter. During the first week in

1. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

July, he learned that appellant and more than three hundred dollars of his money were missing from the filling station.[2]

James Millard Moulton, Jr., was a carpet layer and a tile setter who had been engaged in laying tile in Mrs. Phillips' house during the spring and early summer of 1975. Moulton, a self-confessed alcoholic, told of going to the Hurricane Club in Longview with a woman known to him only as Stormy Summers and, while there drinking with Summers, he had a conversation with appellant who was there playing pool with another man [Doyle Hughes]. During this conversation, appellant told him that he was "a pool hustler and a safe cracker";[3] thereupon, Moulton told appellant that he knew where there was a floor safe that could be cracked and that it probably had some money in it. Appellant "wanted to know, you know, where it was located and who all lived there and where would be the best way to get in and how would be the best way to handle it."

Moulton drew a floor plan sketch of the Phillips home showing the location of the safe in a hall closet of the new addition to the residence. Moulton, Summers, appellant, and Hughes then drove in Moulton's car to the Phillips residence in Gladewater where he pointed out the house to the group before returning to Longview.

We will discuss the admissibility of appellant's confession later, it being sufficient to state at this time that he went into great detail confirming the meeting with Moulton, Summers, and Hughes in the bar, and the trip to Gladewater to view the house. He told of meeting Summers a few days later when they discussed the possibility of burglarizing the Phillips home. He said that on July 8, 1975, he and Summers went to the Phillips house and parked the car. They had a .38 caliber pistol and a "home-made blackjack made out of a piece of flat iron, and a roll of white tape." We continue:

"Stormy took the gun and went to the door pretending her car had broken down. Mrs. Phillips came to the door and let Stormy in. Stormy then held the gun on Mrs. Phillips and let me into the house. I talked to Mrs. Phillips for a couple of minutes and she got the combination to the safe from a drawer where she had it tucked away. The safe is located in the closet next to the rear entrance. Mrs. Phillips told me that there was no money in the safe, but I didn't believe her. I opened the safe and it was empty.

"While I was opening the safe I heard a shot and went back to the bedroom where Stormy had taken Mrs. Phillips.

"Mrs. Phillips was struggling with Stormy but stopped when I came into the room. We attempted to get her to lie down on the bed and stop struggling long enough to tie her up. She continued to fight so I hit her with the homemade blackjack. I was standing behind her when I hit her. The blow knocked her unconscious. We put her on the bed and tied her hands with tape. We also put tape across her mouth. We proceeded to go through the house. We found some costume jewelry and a fur cape.

"I went back to check on Mrs. Phillips. She was moaning and groaning and kicking. I felt the back of her head and the skull felt crushed. I went to the kitchen and got a knife. I went back to the bedroom and stabbed Mrs. Phillips. I stabbed her in the center of the chest."

Other testimony, properly received, disclosed that the stab wound severed the aorta and, according to the pathologist, caused death in a matter of "[n]o more than a half

---

2. The arrest warrant under which appellant was apprehended in Colorado was based upon this incident.

3. This "safe cracker" reference forms the basis of appellant's fifth ground of error which we do not reach.

to one minute." The blow to the head, according to the same source, would have caused death in a matter of hours if untreated.

The State's evidence showed that a pistol had been discharged from inside the bedroom where Mrs. Phillips' body was found, that the knife was taken from her kitchen, and that she was killed during the early evening hours of July 8, 1975.

Appellant did not testify before the jury on either facet of his trial and offered no affirmative evidence. The court's charge, which comes to us without objection, charged that Moulton was an accomplice as a matter of law, and Hughes' participation in the crime was submitted as a question of fact.

■ The first three grounds of error challenge the action of the court in admitting the confession into evidence. We must, therefore, include a lengthy summary of the events which led to the confession.

The appellant was under arrest and in custody of the Gregg County Sheriff's Department for the offense of theft. At the same time he was under suspicion and investigation in the capital murder, the subject of this case. He was taken from Gregg County to Smith County by Ranger Glenn Elliott and Deputy Bill Roach of the Gregg County Sheriff's Department for the purpose of taking a polygraph test. The transfer took place on April 25, 1977, at approximately one o'clock p. m. The polygraph test was to be given by the Department of Public Safety officer Marvin T. McLeroy.

The appellant arrived in Tyler at approximately 1:45 o'clock p. m. Shortly thereafter the interview began for the purpose of polygraph by McLeroy. McLeroy went through the warnings given to a person before he takes a polygraph, and at this point the appellant first voiced his request

to remain silent. The appellant informed McLeroy that he did not wish to take the test and that it was not voluntary on the part of the appellant. This was in response to direct examination from the State. At this point in time, according to appellant's contention, the purpose of being in Smith County had ceased to exist with the refusal to take the polygraph, and all interrogation should have ceased and the appellant returned to Gregg County. However, the questioning continued by the officers.

McLeroy further acknowledged the refusal on the part of the appellant to talk to him on cross-examination. After the refusal to sign the necessary waiver, he began to question the appellant about the offense and the appellant continued to refuse to talk.

McLeroy continued to question the appellant throughout the afternoon on two different occasions during continued interrogation by other officers, and the appellant always refused to talk about the offense.

He further testified that the D.P.S. Headquarters in Tyler was so set up that he could witness the interrogation by other officers, that during the interrogation by other officers he saw and heard the appellant make a request for a "couple of days to get this straight in his mind." This request was made by the appellant in response to an interrogation, and it was first made to Ranger Glenn Elliott.

It is further shown that Elliott refused to honor the request and continued to question the appellant at will, and that this interrogation continued intermittently for several hours. Elliott further testified that the request for a "couple of days" was made to him at least two different times during the time of the interrogation and that he witnessed the same request made of Deputy Roach during his interrogation. The testimony of Roach is primarily the same as that of Elliott. The testimony from the appellant further explains the numerous re-

quests made by him on the day of interrogation. The appellant made the same requests of all three persons, Elliott, Roach and McLeroy. The request came after the refusal to take the polygraph without an attorney present. Appellant told all three that he did not want to talk about it and wanted a lawyer. All three ignored the request to remain silent and chose to continue interrogation. The appellant never openly agreed to further interrogation by any party.

Unquestionably, from appellant's own testimony, it was established that he never at any time specifically asked for the appointment of a lawyer or for time to consult with counsel. Likewise, it is equally certain that he was not abused either mentally or physically during the interrogation, and that he fully and completely understood his legal rights as explained to him by Judge Cashell and each of the interrogating officers. It is to be noted, too, that Roach testified he told appellant that if he wanted a lawyer he could request one who would be provided at the State's expense.

At the outset of our discussion, we note that where the facts adduced at a suppression hearing are in dispute, "the trial judge is the trier of the facts and can accept or reject the testimony of witnesses, including a defendant, in determining the issues before him." *McKittrick v. State*, 541 S.W.2d 177, 184 (Tex.Cr.App.1976). With that in mind, we will now consider appellant's contentions.

Appellant contends that his federal constitutional rights were violated under the rule laid down in *Miranda v. Arizona*, 384 U.S. 436, 473, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694, 723 (1966):

"Once warnings have been given, the subsequent procedure is clear. *If the individual indicates in any manner, at any time* prior to or during questioning, *that he wishes to remain silent, the interrogation must cease.*"

He also relies upon language found in *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975), to the effect that "his 'right to cut off questioning' was [*not*] 'scrupulously honored.'"

All of the participants in the interrogation process agree that appellant asked each of the officers for time within which to consider the matter before he signed the confession. Thus, the language used by this Court in *Hearne v. State*, 534 S.W.2d 703, 706–707 (Tex.Cr.App.1976), becomes material. There, it was said:

"While the Supreme Court left unanswered the issue of when and under what circumstances questioning of the accused may resume, it left no room for doubt that the admissibility of a statement taken from a person in custody depends on whether his ' "right to cut off questioning" was "scrupulously honored." ' "

We say again as we said in *Hearne*, supra:

"The clear and inescapable conclusion from the officer's testimony is that interrogation continued after appellant had made it known that he wished to remain silent." (Id.)

See also *Ochoa v. State*, 573 S.W.2d 796, 800 (Tex.Cr.App.1978).

State's counsel mistakenly relies upon language used in *Williams v. State*, 566 S.W.2d 919, 922 (Tex.Cr.App.1978), discussing *Michigan v. Mosley*, supra. As we have noted earlier, while *Mosley* is a limitation upon the broad language found in *Miranda*, supra, it is not a repudiation thereof. In *Mosley*, the interrogation was "about an unrelated homicide." Here, the continued questioning was about the murder of Mrs. Phillips.

The fact that appellant was not physically mistreated during his incarceration or interrogation does not remove the taint to the confession which was secured in viola-

tion of his federally guaranteed constitutional rights as noted in *Miranda* and *Mosley*, both supra, and his rights vouched unto him by our Texas constitution and statutes.

Here, the officers, after each had been told that appellant needed a "couple of days to get this straight in [my] mind," made no pretense of interrupting or changing their line of interrogation. The only change was that the officers in the room would change. It took between three and four hours of interrogation by three officers, in a hidden room out of the county in which he was arrested, in the presence of a lie detector machine, to extract slowly the confession from appellant.

As said in *Ochoa*, supra:

"*Miranda* imposes rigid requirements in order to insure the voluntariness of a confession, and these requirements must themselves be satisfied in order for a confession to be admissible." (573 S.W.2d at 801)

Accordingly, the judgment is reversed and the cause is remanded.

Opinion approved by the Court.

STATE'S MOTION FOR REHEARING

CLINTON, Judge.

On original submission a unanimous Court reversed this cause on the ground that the written statement confessing to this capital murder was taken under coercive circumstances rendering such statement inadmissible under the authority of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1975), *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) and cases decided by this Court. We denied leave to file the State's motion for rehearing; however, the factual recitation and consequently, the legal conclusions

evidenced by the opinion on original submission were vigorously questioned by the dissent to the denial of the State's leave to file and a majority of this Court therefore ordered a stay of the mandate, as well as the State's leave to file.

■ The only seriously disputed fact issue revealed by this record is whether appellant advised the interrogating officers that he desired the advice of counsel. Because the trial court as the sole trier of fact, found that no such request was made, this Court is not at liberty to disturb such finding. *McKittrick v. State*, 541 S.W.2d 177 (Tex.Cr.App.1976). All of the officers observed through a one-way mirror the conversations had by each of the other officers with appellant, unless otherwise indicated. The following recitation is of relevant facts and circumstances adduced at the hearing on the motion to suppress which are substantially uncontradicted unless so designated.

On April 20, 1977, appellant was extradited from Colorado on a warrant for his arrest for the offense of theft in the amount of $320.00. The next morning, he was taken before Justice of the Peace Charles Cashell, who advised appellant he was charged with the offense of theft, read appellant his magistrate's warning and set his bond at $50,000.00. Appellant understood the warning and did not at that time request the assistance of counsel because he intended to enter a guilty plea to the theft and felt he did not need one. The next morning, a Friday, appellant met with Captain Bill Roach of the Gregg County Sheriff's Department and Department of Public Safety Texas Ranger Glenn Elliott in Roach's office in the Gregg County Courthouse. He was advised of his *Miranda* rights and a brief discussion of the theft offense ensued.

According to Elliott, he and Roach "then informed [appellant] that [they] were inves-

tigating a homicide in Gladewater ..., which was a capital offense, and that [they] were interested in his activities on or about July 8, 1975." Appellant advised the officers of where he thought he had been, and they in turn asked whether he would be willing to submit to a polygraph examination regarding the capital murder. Upon appellant's agreement, Elliott arranged the polygraph for April 25, the following Monday, at 2:00 p. m. in Tyler. Roach, Elliott and appellant arrived in Tyler at approximately 1:45 p. m. on the appointed day after a forty five minute trip in which the murder was not discussed.

On arrival at D.P.S.[1] headquarters in Tyler, appellant was placed in a holdover cell for a short while during which Elliott and Roach briefed the polygraph examiner, Officer Marvin McLeroy, on the subject to be examined. McLeroy then brought appellant into the polygraph room[2] and spent approximately 30 minutes with appellant completing a "pre-test interview" in which he obtained personal data, such as appellant's general health, physical condition that morning, education, criminal record and the like. McLeroy then explained the process of a polygraph test and advised appellant:

> I told him that polygraph tests were simply a voluntary test, that he could not be forced to take it, that if he knew that he could not pass the test that my advice to him would be to not take the test. I told him that there were basically three things which could probably make him fail the polygraph test. I told him, number one, that if he actually did do what it was that he was suspected of doing that he would probably fail the test; that if he knew for a fact who did do what he was suspected of doing or if he was intentionally withholding knowledge from me about, or from the investigators about what he was accused of doing, that this would probably make him fail this polygraph test. At this point in time the subject indicated to me that he better not take the polygraph test, that it was his desire, that it was his wish that he did not take the polygraph test.

Appellant refused to sign the polygraph consent form.

McLeroy then asked appellant whether he would talk to him about why he, appellant, was there. According to McLeroy appellant replied: "I just as well talk to you; I've talked to just about everybody else." McLeroy then read appellant his rights and apparently it was at this point that a discussion of the electric chair commenced, the content of which was disputed.[3] According

---

1. Department of Public Safety.

2. Testimony of McLeroy described the polygraph room thus:
   Q: And your statement is that that room is isolated from the rest of the building.
   A: That room is isolated, closed off, yes, sir.
   Q: O.K. And it's closed off to the extent that there's a one-way mirror, a lie detector table, an inter-com system between the two rooms and it's actually towards the back. You have to walk through the lab to get back to it, do you not?
   A: You walk down a hall.
   Q: Walk down a hall and the lab is on the right-hand side?
   A: Yes, sir.
   Q: So, that's not a place where the public freely wanders around getting driver's license is it?

A: That's correct.
Q: All right. Would you then say that the interrogation of the Defendant in the lie detector room was in a pretty secluded, out-of-the-way spot?
A: Yes.

3. According to appellant, McLeroy described for him the physical effects on the human body of the administration of electrocution. While admitting he discussed the electric chair with appellant "prior to the first interview," McLeroy denied that its effects on the human body were discussed, and testified that the discussion was based upon his asking appellant what he thought should happen to the person who committed the murder.

to McLeroy, he then began interrogation of appellant regarding the murder which lasted for approximately 30 more minutes. McLeroy was asked:

Q: He didn't talk to you about that, did he? So, in essence, he did not . . . talk to you or answer any questions of yours concerning this accusation, did he?

A: No.

McLeroy left appellant in the room and explained to the other officers that appellant had refused to consent to taking the polygraph. Ranger Elliott then went into the room with appellant.

Elliott warned appellant and asked him why he did not want to take the polygraph. According to Elliott, appellant "said he'd never had a test before and he wasn't sure it was the right thing to do." Elliott then told appellant he was investigating this capital murder and asked about appellant's associates in Longview. Elliott testified:

I tried to get better acquainted with him. I tried to get a little bit closer to him so he could talk freely to me and during this conversation *he indicated to me that he would like to have a couple of days to get this straight in his mind, and I talked to him.*

On cross examination, Elliott was asked:

Q: Did you ask him any facts concerning this capital murder in Gladewater?

A: Yes, sir, I asked him.

Q: *Did he want to talk to you about it at that time?*

A: He indicated that he knew about the murder and that he just, but *he wanted to wait a little but, a little while, a couple of days to put it down.*

Q: *He wanted to wait a couple of days in regard to giving a statement about it?*

A: *That's the way I took it.*

After 20 to 30 minutes of interrogation in which appellant continued to give no incriminating information, Elliott left.

Captain Roach then entered the polygraph room and orally advised appellant of his rights. According to Elliott,[4] who was observing through the mirror:

[This interview] was along the same lines. Stan had already—Mr. Faulder had already indicated to us that he—to me that he had knowledge of the crime that we were talking about, *but he wasn't ready to talk about it. And Mr. Roach started his interview along the same lines that I did, to get better acquainted with him and trying to persuade him to go ahead and tell us his story about what happened on July the 8th, 1975, over at Mrs. Inez Phillips' home in Gladewater.*

After approximately 15 minutes, Roach left and McLeroy reentered.[5] The only salient testimony regarding the content of this portion of interrogation was elicited on cross examination from McLeroy:

A: —subject then told me orally, *I said to him, I said, "You don't need a couple of days to get this straight. You know right now, today, as to whether or not you could pass a polygraph test; isn't that correct?"* He said, "Yes."

Q: All right. What brought up the couple of days? Why did you say, "You don't need a couple of days?" Hadn't Mr. Faulder told you that he wanted a couple of days to think—

A: I overheard him tell Roach or Elliott that he needed a couple of days.

---

4. The witness Roach gave very little testimony about this interview other than that it was short, lasting about 15 minutes.

5. It is unclear whether Ranger Elliott did not witness all or only portions of McLeroy's second interview with appellant.

After approximately 15 minutes, McLeroy left and Elliott came back into the room with appellant for about 15 minutes. According to Elliott,

A: I went back in and talked to him again briefly, myself.

Q: All right. And what then occurred?

A: Well, *he still said that he just would like to think about it and get it all a little bit clearer in his mind, all the details*, and this was about the only thing that he said about the crime to me. He indicated, as I said, testified before, that he had knowledge, *but he just wasn't quite ready to discuss it.*

After Elliott left, Roach re-entered the room. It was about 4:30 p. m. According to Roach, appellant had at this point made no incriminating statements, and had given no indication that he wanted to talk with anyone about his involvement in the murder. Roach took into the polygraph room a pad of paper on which he had written the date: "July 8, 1975." Roach testified that he then turned the note pad around and wrote the names of six people, names he had obtained from Elliott. He questioned appellant about each item on the paper. Roach stated, "when I got to the name Stormie Summers, Stan sat there for a minute. He said, 'I can't at this time tell you about it, but if you'll give me a piece of paper, I'll try to write it down'." Roach provided the requested items and appellant wrote one long paragraph.[6] Roach continued, "He handed the paper to me. He told me to read it and said, 'After you read this I think I can talk to you about it'."

After Roach read the paragraph, he brought appellant out of the polygraph room into McLeroy's outer office and went outside to his car to get Gregg County statement and waiver forms. Back inside, Roach filled out the waiver, read it to appellant, handed it to appellant and had appellant recite a line of the content in order to confirm that appellant was literate. Appellant signed the waiver of rights form.

Appellant then drew a diagram of the house in which the capital murder occurred and began relating the details of the offense. Roach chronicled the events by hand, had it typed, and at 7:22 p. m., after appellant had both been read the statement, including warnings at the top, and had himself read the statement, he signed, dated and wrote down the time on it. Ranger Elliott testified that appellant "seemed relieved."

Appellant, as well as the three law enforcement witnesses, testified that he had been advised of his rights several times through the day, that he understood his rights, that he had been allowed to drink, smoke and use the restroom, that no firearms had been displayed, no overt threats were used[7] and that appellant was in no way mistreated. Additionally, it is uncontradicted that appellant had refused to involve himself in the murder and never gave any indication that he wanted to talk about his involvement during what was described by the witnesses as "continuing interrogation." The officers all agreed that they had not "taken" appellant's statements regarding "needing a couple of days ..." as a request to stop interrogation, but rather, an expression of his lack of desire to give a final statement at that time.[8] On cross

---

6. All three officers testified that appellant wrote "one long paragraph." However, this writing, identified as State's Exhibit No. 4, reveals two short paragraphs.

7. Appellant did testify that McLeroy had discussed with him the prison social structure in which McLeroy allegedly told him that he would be the object of sexual assaults. McLer-

oy, however, testified that he did not "recall" such a conversation but conceded that he "could have" had it.

8. A reason offered by Elliott for this interpretation was that appellant continued to answer his questions. Elliott admitted, however, that appellant gave him no incriminating information.

examination, the prosecutor asked appellant whether the "real" reason for his having wanted "a couple of days" was that he was wondering "who all" to implicate. Appellant acknowledged that this had been a consideration but denied that it was the prime reason.[9] Appellant was asked why he signed the statement and he replied that he thought it was the only way to "get out of there." The prosecutor asked appellant, "Did you tell them I'd like to think about it and get it clear in my mind before I sign that page [of the statement] after you read it?" Appellant replied, "I spent the whole afternoon telling them that and it didn't do any good."

In *Miranda*, supra, the Supreme Court of the United States expressed its concern for the atmosphere of custodial interrogation of criminal suspects, in which no overt physical coercion nor patent psychological ploys have been applied. Identifying as its goal the specification of proper limitations upon custodial interrogations, the Court set out procedural requirements to be therein employed by law enforcement officials. The Court made clear the necessity of advising persons criminally accused of their right against self-incrimination and their right to counsel, and the requirement that once a defendant invokes a *Miranda* right, all interrogation must cease. Stated the Court at p. 1612 of 86 S.Ct.:

> The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, *if the individual* is alone and *indicates in any manner* that *he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions* or volunteered some statements on his own

does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.*

In *Michigan v. Mosley*,[10] supra, the Supreme Court was confronted with a question as to whether the *Miranda* guidelines had been violated where the accused invoked his right to remain silent regarding some robbery offenses, and after a two hour interval, on being again advised of his rights, implicated himself in an unrelated homicide. The Court stated in this regard:

> "A reasonable and faithful interpretation of the *Miranda* opinion must rest on the *intention of the Court* in that case *to adopt 'fully effective means . . . to notify* the person of his right of silence and *to assure that the exercise of the right will be scrupulously honored . . . .'* [citations omitted] The *critical safeguard* identified in the passage at issue *is a person's 'right to cut off questioning.'* [citations omitted] *Through the exercise of his option* to terminate questioning *he can control the time at which questioning occurs, the subjects discussed, and the duration of* the *interrogation.* The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored'." *Mosley* at p. 326 of 96 S.Ct.

Where the facts are in dispute, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony; however, the threshold question presented here is not one regarding credibility of the interrogating officers,

---

**9.** Appellant testified that one reason was that he wanted legal advice.

**10.** Hereinafter cited as *Mosley.*

nor of the good faith of the officers in their subjective interpretations of appellant's uncontradicted assertions of wanting "to wait a couple of days . . .," but whether appellant "in any manner" invoked his right to remain silent and, if so, whether such right was "scrupulously honored."

We believe that the inescapable conclusion from the verbatim testimony of the law enforcement officers recited *ante*, is that appellant did "indicate" in "some manner" his "desire" to invoke his right against self incrimination. Appellant's refusal to incriminate himself in some three hours of continuous interrogation is an additional circumstance which corroborates his assertion that his statements of "needing" or "wanting a couple of days . . ." were *intended* to *indicate* in *some manner* that he was invoking his right to remain silent. Further support for this conclusion is found in testimony showing that Captain Roach deemed it necessary to try to "*persuade* [appellant] to go ahead and tell . . . his story about what happened . . . ," as well as that Marvin McLeroy felt obliged to argue with appellant about his need for a couple of days. [See, *ante*, at 633–634.]

Finally, it is clear that even if we agreed with the officers' asserted interpretation of appellant's statements—that he was *not* requesting that interrogation cease, but rather, expressing his desire to wait a couple of days before giving a final statement—no different conclusion would be impelled. In *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977),[11] the Supreme Court concluded that the accused's "statements . . . that he would tell the whole story *after* seeing [his lawyer] were the clearest expressions by Williams himself that he desired the presence of an attorney before any interrogation took place." *Brewer* at p. 1242 of 97 S.Ct. [Emphasis original.] See also *Hearne v. State*, 534 S.W.2d 703 (Tex.Cr.App.1976).

Likewise, we are unpersuaded by the State's assertion that appellant's *reason* for "wanting a couple of days . . ." was to give him time to decide "who all" to implicate. Even if this were established by the record, which it is not, there is nothing inherent in such a consideration which negates the accused's desire to refrain from incriminating *himself*.

We hold that this appellant did *indicate* to the interrogating officers that he wished to invoke his right against self incrimination, and there is no dispute that thereafter, the interrogation did not cease. Accordingly, appellant's right was not "scrupulously honored" and the guidelines specified by *Miranda* were thereby violated. *Brewer; Mosley; Ochoa v. State*, 573 S.W.2d 796 (Tex.Cr.App.1978); *Hearne v. State*, supra.

The State nevertheless urges that appellant ultimately waived his Fifth Amendment right and his statement was thereby rendered admissible. The State points to the facts found by the trial court that appellant never requested an attorney and never stated: "I request that the interrogation cease," or words to that specific effect. Furthermore, according to the State's assertion, appellant signed two documents entitled "Waiver of Rights Form"—one at 2:30 p. m. and another at 5:47 p. m.—which reflect his acknowledgement that he was given all warnings required by *Miranda*; additionally, when appellant signed the typed statement admitting his guilt, such statement included a specific waiver of his rights. Finally, the State assigns great significance to the fact that appellant, after approximately three hours of interrogation advised Captain Roach that "I can't at this time tell you about it, but if you'll give me a piece of paper, I'll try to write it down," citing *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).[12]

In *Butler*, the accused refused to sign a waiver of rights form offered him by F.B.I.

---

**11.** Hereinafter cited as *Brewer*.

**12.** Hereinafter cited as *Butler*.

agents at the outset of interrogation. Upon ascertaining that Butler understood his rights, the agents advised him they would like to talk, and the accused replied "I will talk to you but I am not signing any form." Thereafter Butler incriminated himself. The Supreme Court discussed the concept of waiver at length: "[In *Miranda*] this Court said that

> If the interrogation continues without the presence of an attorney [a request for which invokes the Fifth Amendment right to silence *per se*] and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to . . . counsel. [citations omitted]"

Further interpreting *Miranda's* waiver prescriptions the Court in *Butler* continued at p. 1757 of 99 S.Ct.:

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but *is not inevitably* either necessary or *sufficient to establish waiver. The question is not one of form*, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. *The courts must presume that a defendant did not waive his rights; the prosecution's burden is great*; but in at least some cases waiver can be *clearly*

inferred from the actions and words of the person interrogated.

The Court concluded that "the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461. . . ." *Butler* at p. 1758. See also *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).[13]

■ Initially we observe that the trial court found as a fact that appellant waived his constitutional rights.[14] The question of waiver, however, is not a question of fact, but an issue of Federal Constitutional Law. *Brewer.* It is apparent then that the trial court applied an incorrect constitutional standard in determining the issue of waiver by which this Court is not bound. *Id.*

■ Applying these principles to the circumstances of this case, it is clear that the State has failed to meet its "great" burden of showing a relinquishment of the right to silence on the part of this appellant. The only evidence of waiver contained in this record is the appellant's signed confession which included a waiver recitation at the top, and which followed his statement that he could not talk about it, but would "try to write it down."

*Miranda* teaches that no weight is to be given a failure on the part of the accused to specifically request an attorney's assistance or that interrogation cease in the exact language of that case, or, for that matter, at all; likewise, "the mere fact" that appellant answered the officers' questions raises no presumption of waiver. Here, appellant indicated his intention to invoke his Fifth

---

13.  Hereinafter cited as *Fare*.

14.  Also found as a fact was that appellant waived his rights under Article 38.22, V.A.C.C.P. As a conclusion of law in these regards, the trial court stated:

"Joseph Stanley Faulder, after repeated warnings, knowingly, intelligently, and voluntarily waived his rights under Art. 38.22, V.A.C.C.P., including his right to counsel, and his right to remain silent, prior to and during the making of the statement."

Amendment right soon after the outset of interrogation, but was denied a "full and fair opportunity to exercise that option." See *Miranda*; cf. *Mosley*. Unlike *Mosley* the case before us is one "where the police failed to honor a decision . . . to cut off questioning . . . by refusing to discontinue the interrogation upon request [and] by persisting in repeated efforts to wear down [appellant's] resistance and make him change his mind." *Id.* at p. 327 of 96 S.Ct. In contrast to the circumstances shown by both *Fare* and *Butler*, there has been no showing that appellant *"clearly"* indicated a willingness to waive his constitutional right against self incrimination.

Having found no evidence to support the trial court's finding that appellant did not invoke his Fifth Amendment right against self incrimination, and having rejected the standard applied by the trial court in concluding that the State met its burden of proving appellant waived such right, we hold that the trial court committed reversible error through its failure to suppress appellant's statement obtained in violation of his right to remain silent.

The State's motion for rehearing is overruled.

DOUGLAS, Judge, dissenting.

The prior dissenting opinion is withdrawn.

The majority overrules the State's motion for rehearing on the ground that appellant asked the officers for two days to get things straight in his mind before talking to them. Appellant testified that the reason he did not want to talk at that time was that he did not know who to involve in the crime. When he later determined that the officers knew who were involved in the crime, he was ready to confess. He wrote the confession in his own handwriting.

The Supreme Court of the United States has held that the totality of the circum-

stances should be considered in determining if a confession were voluntarily made. His reason to remain silent no longer existed when he found out that the officers knew the others who were involved. He then voluntarily wrote the confession in his own handwriting.

The majority does not apply the holdings of *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), and *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), which are the most recent Supreme Court interpretations of *Miranda*.

In *Butler*, the defendant was interrogated by FBI agents in New York concerning a North Carolina robbery. The agents established that the suspect had an eleventh grade education and was literate. He then was given the Bureau's "Advice of Rights" form. The defendant stated that he understood his rights but he refused to sign the waiver at the bottom of the form. The agents then stated that they would like to talk with him further, and he replied: "I will talk to you but I am not signing any form." He then made inculpatory statements.

In holding the inculpatory statements admissible, the Supreme Court stated:

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the

prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated. [footnote omitted]

"... This is not the first criminal case to question whether a defendant waived his constitutional rights. It is an issue with which courts must repeatedly deal. Even when the right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' *Johnson v. Zerbst*, 304 U.S. 458, 464 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461]. See also *United States v. Washington*, 431 U.S. 181, 188 [97 S.Ct. 1814, 1819, 52 L.Ed.2d 238]; *Schneckloth v. Bustamonte*, 412 U.S. 218 [93 S.Ct. 2041, 36 L.Ed.2d 854; *Frazier v. Cupp*, 394 U.S. 731, 739 [89 S.Ct. 1420, 1424, 22 L.Ed.2d 684]."

In *Fare v. Michael C.*, supra, a juvenile was warned of his rights under *Miranda v. Arizona.* He asked if he could have his probation officer present. The officers did not get his probation officer and the juvenile confessed. The Supreme Court of the United States reversed the Supreme Court of California which had held that the request for the probation officer to be a per se violation of the minor's Fifth Amendment rights in the same way the request for an attorney was found in *Miranda* to be, regardless of what the interrogation otherwise might reveal.

The Supreme Court discussed *North Carolina v. Butler, supra,* and held that the asking for the probation officer did not invoke *Miranda.* The Court applied the totality of the circumstances test and held the confession to be admissible.

In the present case, Faulder did not ask for an attorney; he asked for time "... to get it straight" and then confessed in his own handwriting.

On Friday, April 22, 1977, Captain Bill Roach of the Gregg County Sheriff's Department gave appellant the standard *Miranda* warning. Appellant stated that he understood his rights and did not want an attorney. He did agree to take a polygraph test concerning the murder in question.

On Monday, April 25, 1977, Roach, Texas Ranger Glenn Elliott and appellant arrived in Tyler at approximately 2:00 p. m. for the polygraph examination. Appellant then declined to be tested. Marvin McLeroy, the polygraph examiner, testified that after appellant's refusal he terminated the test and asked appellant, "Would it be all right if I interviewed him pertaining to this particular case myself. Subject indicated to me that it would. At that point in time, before any questions were asked, I told him the standard *Miranda* warning, read it to him, and subject read it and signed it." He signed the waiver form three times.

McLeroy informed appellant that the police were planning to question him regarding the instant murder. After a fifteen minute interview, McLeroy left and Ranger Elliott continued the interview at 2:30 p. m. Elliott initially read appellant his rights again. "During this talk, the defendant indicated to me that he would like a couple of days to get this straight in his mind, and I talked to him." This need to get things straight was brought up twice by appellant, and during cross-examination Elliott agreed that he took it to mean that appellant wanted to wait a couple of days in regards to giving a statement about the murder. Appellant never asked any of the officers to stop questioning him and all of them testified that appellant was fully cognizant of his rights.

Elliott's first interview lasted thirty minutes and he was followed by Roach who also initially questioned appellant for thirty minutes. McLeroy, Elliott and Roach all interviewed appellant a second time. Each officer warned appellant before conducting the interview.

Later, Roach read a list of names to appellant. In a situation very similar to that in the *Butler* case, appellant told Captain Bill Roach of the Gregg County Sheriff's Department that "I can't at this time tell you about it, but if you'll give me a piece of paper, I'll write it down for you." Thereafter, appellant confessed his participation in the murder in his own handwriting.

Roach left and returned with confession forms. Appellant was brought into the reception area of the building at 5:00 p. m. and signed the waiver of rights form at 5:47 p. m. He read aloud the portion of the waiver regarding his right to counsel and initialed it. Appellant then drew a diagram of the victim's house while the statement was typed. The statement was read by appellant, read to him by the officers and he was given an opportunity to make corrections before signing it. The confession was signed at 7:22 p. m. Two of the five hours appellant was in Tyler were consumed by appellant giving the details of the confession and typing it.

During the interview appellant had been allowed to smoke cigarettes, drink coffee and use the bathroom. Although most of the interview occurred in the polygraph room which is relatively secluded, that office was accessible to the other departments at the Tyler DPS office including: Weight and Motor Vehicle Inspection, Narcotics, Intelligence, Auto Theft, Rangers, Patrol, Laboratory and Driver's License. The bathroom used by appellant was in a hall by the driver's license facility and "some citizens were coming in and out of the area."

Roach stated that each time he orally warned appellant he asked appellant if he understood his rights. The officers testified that appellant never requested to see an attorney nor did he ask that the questioning cease. Appellant received his *Miranda* warnings six times during the interviews.

Appellant, on the other hand, testified that he requested an attorney while being interviewed and remembered telling the officers he needed time to think about things. He said he made these requests "ten or twelve times." He admitted that he had not asked for an attorney when he was brought in front of a magistrate prior to and the day after his confession. He conceded that it was possible that he had received warnings from Roach and Elliott. He stated that he understood his rights and knowingly signed the confession.

The polygraph room in which the interview was conducted is equipped with a one-way mirror, an intercom and a polygraph machine on a table in the middle of the room. As noted above, although somewhat secluded, it was fairly accessible to other areas of the building. It was not a hidden room as described in the original opinion. No weapons were exhibited during the interview.

In the opinion on original submission, speaking of the officers, it is written:

"All three ignored the request to remain silent and chose to continue interrogation."

There is no testimony to that effect. It is a conclusion on the part of the writer.

There is disputed testimony concerning appellant's request for a lawyer. Appellant testified that he stated that he wanted a lawyer. Three officers testified that he never stated that he wanted a lawyer and one testified that appellant stated that he did not want a lawyer.

There is no evidence of a "hidden room." This was shown to be a room where the polygraph operator had the machine and when the confession was given it was outside in the lobby of the office of the polygraph operator.

The justice of the peace warned appellant of his *Miranda* rights. Captain Roach

warned him of his rights and that he had a right to stop the interview at any time. Appellant agreed to take the lie detector test.

Roach mentioned Stormie Summers' name and that of another person. Appellant said, "I can't talk about it but if you will give me a pencil and a piece of paper I can write it down", and later he stated that the reason he wrote it down was because he had to think about what he wanted to put in the confession. He stated that he really wanted to see who he would involve in the confession. The names given him by Captain Roach were some of those that were involved in the discussion or in the commission of the crime.

Roach read the confession aloud and all of appellant's rights were listed on it. Appellant then read the warning which contained the statement that he could end it at any time and he signed his name. Appellant had an opportunity to make changes in the confession and he did so. Appellant testified that he knew he had a right to a lawyer and knew that he had a right to stop the conversation and that he had a prison record.

Concerning the taking of the polygraph examination, McLeroy testified that he told appellant not to take the test unless he thought he could pass it. After that, appellant refused to take the test.

There is no statement in the record that he asked to remain silent or that he asked them not to interrogate him. He said that he wanted a couple of days to get it straight in his mind. With the above qualifications, that he wanted to see who he would involve in the confession and that he had rather write it down than to tell it, it goes to the totality of the circumstances

that he never demanded to end the interrogation, that he never asked to end the interview, that he never indicated that he wished to end the interview.

After he read what he had written down personally, he said that he thought he could talk about it then.

Appellant testified that he knew that he had a right to a lawyer; that he could stop the interrogation at any time and he understood the other rights; that he did not request the appointment of an attorney. He admitted that he told Roach that "I can't talk to you about it but I will write it down"; that it was easier to write down than it was to talk about it.

After he refused to take the polygraph examination, he was asked by McLeroy if he wanted to talk about it. He replied: "I just as well talk to you. I've talked to just everybody else." McLeroy testified that appellant freely talked to him but he did not readily admit his implication.

When one reads the record and under the totality of the circumstances, the refusal to take a lie detector test is not a request for the interrogation to cease. It should be remembered that the operator of the polygraph machine stated to the appellant not to take the test unless he thought he could pass it. Then immediately thereafter appellant said that he might as well talk to him (the operator) because he had talked to everyone else.[1]

It appears that the two days that he wanted to get it straight in his mind was not a request to stop the interrogation but apparently to not implicate all the people that were involved in the burglary and homicide. In *North Carolina v. Butler*, supra, Butler told the officers: "I will talk to you but I'm not signing any form." The

---

1. Since there is a different interpretation in the evidence relied upon by the majority and in this opinion, a more detailed statement of the testi-

mony with references to the page numbers is set out as an appendix.

Court held in that case that the totality of the circumstances showed that he waived his rights. The Court held:

"... [B]ut in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."

and

"... 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461. See also *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238; *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854; *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684."

In *Fare v. Michael C.*, supra, the Supreme Court of the United States applied the totality of the circumstances test. The juvenile who was on probation at the time asked to see his probation officer. The Supreme Court held that there was sufficient evidence under the totality of the circumstances to show that he waived his right to remain silent.

In *Williams v. State*, 566 S.W.2d 919 (Tex.Cr.App.1976), this Court held that although under the totality of the circumstances the State must prove "an intentional relinquishment of a known right," an express waiver is not required. See *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Moreno v. State*, 511 S.W.2d 273 (Tex.Cr.App.1974). Where the facts are in dispute, the trial judge as the fact finder can accept or reject all or any part of the testimony of any witness, including the defendant. *Williams v. State*, supra; *McKittrick v. State*, 541 S.W.2d 177 (Tex.Cr.App.1976).

The majority has not only refused to re-examine this case in light of *North Carolina v. Butler*, supra, and *Fare v. Michael C.*, supra, but its opinion goes so far as to hold the vague and ambiguous statement about a need to "get things straight in my mind" by a defendant fully cognizant of his rights renders a subsequent confession inadmissible. This is contrary to the two recent United States Supreme Court cases cited above and to sound reasoning.

The State's motion for rehearing should be granted and the judgment should be affirmed.

DALLY and W. C. DAVIS, JJ., join in this dissent.

## APPENDIX

### I. Chronological Summary of Facts

*Wednesday and Thursday, April 20 and 21, 1977*

Appellant was arrested and returned to Longview on a warrant issued in connection with an unrelated theft case. He arrived in Longview at about 9:00 p. m., April 20. (463) At 10:30 a. m. the following morning, appellant was taken before J.P. Charles Cashell and given his magistrate's warning. (231) Appellant testified at the suppression hearing that he understood his rights at this time and that he did not request a lawyer because he felt that he did not need one. (484)

*Friday April 22, 1977*

At 9:10 a. m., appellant met with Deputy Bill Roach and Ranger Glenn Elliott in Roach's office in the Gregg County Courthouse. Prior to any discussion, appellant was advised of his *Miranda* rights. (282, 417) According to the officers, appellant's rights were discussed at length and he answered negatively when asked if he wanted a lawyer. (283, 343, 418) The officers discussed the theft case briefly, then informed appellant he was a suspect in this capital murder case. This interview lasted until 10:43 a. m.

(288, 418) Appellant agreed to take a polygraph test, and an appointment for the test was made. (286) Appellant's version of this interview conforms with that of the officers. (486–491)

*Monday, April 25, 1977*

Elliott, Roach, and appellant left Longview at 1:00 p. m. and drove to Department of Public Safety headquarters in Tyler where the polygraph test was to take place. (288, 418) They arrived at about 1:45. (327, 363) Appellant was placed in a lockup for a few minutes while Elliott and Roach briefed Marvin McLeroy, the polygraph operator. (291, 363)

McLeroy's office consisted of a large outer office, in which his desk was located, and two smaller adjoining rooms. The polygraph was in one of these rooms. The other room was an observation room; the polygraph room was wired for sound and there was a two-way mirror. (292) Throughout the afternoon, only one officer was in the polygraph room with appellant at any given time; the other two were usually in the observation room.

Appellant was brought to the polygraph room at about 2:00 p. m., and McLeroy began his "pre-test interview," consisting of various personal questions. (363) McLeroy then explained the test to appellant, and advised him not to take it if he was guilty or if he had any information that he wanted to conceal. (367) Appellant then told McLeroy that he did not want to take the test. This had taken about 30 minutes, which would make the time 2:30. (395)

Up to this point, there is no dispute between the officers and appellant as to the events on April 25.

After appellant refused the test, McLeroy "asked the subject would it be all right if I interviewed him pertaining to this particular case, myself. Subject indicated to me that it would. At that point, in time, before any questions were asked, I told him the standard Miranda warning, read it to him, and subject read it and signed it (a waiver of rights form, SX 8, 1479)." (368, lines 18–24) McLeroy asked appellant if he needed a lawyer, and appellant said, "No." (371, 403) McLeroy and appellant then talked until about 3:00; appellant's answers to McLeroy's questions were uninformative. (372, 394, 366)

McLeroy left the polygraph room at 3:00 and Elliott entered. (294, 372) Elliott again informed appellant of his rights, and talked to appellant for about thirty minutes. (294, 373) During this conversation, appellant told Elliott, "I need a couple of days to get it all straight," or words to that effect. (296, 329) This interview lasted about thirty minutes. Elliott then left and Roach entered the polygraph room; the time would now be about 3:30. (296, 375)

Roach also talked to appellant for thirty minutes. (375) Before he began, he also informed appellant of his rights. (343, 421) During these first conversations with Elliott and Roach, appellant was questioned generally about his activities and associates at the time of the murder. (295, 296)

At 4:00, McLeroy reentered the polygraph room, followed by Elliott at 4:15 and Roach at 4:30. It is not clear from the record whether the three officers again advised appellant of his rights before beginning their second conversations. (299, 300; 375, 376; 422) During his second conversation with Elliott, appellant again said he needed time to think and get it all clear in his mind. (299)

As of 4:30, when Roach entered the polygraph room for the second time, appellant had made no incriminating statements. (409) During this second conversation, Roach showed appellant a list of names he had written on a note pad and asked him about each of the names. "When I got to the name Stormie Summers, Stan sat there for a minute. He said, 'I can't at this time tell you about it, but if you'll give me a piece of paper, I'll try to write it down.'" (424, lines 4–7; also 301, 376) Roach gave appellant a pen and paper, and he wrote a short two-paragraph statement (SX 4, 1454)

describing the events at the Phillips house from the time appellant and Summers entered until he hit the deceased with the blackjack. (304, 376, 424) Appellant handed Roach this statement and said, "After you read this I think I can talk to you about it." (425, lines 10 and 11; also 307)

It was now approximately 5:00 p. m. (332) Roach immediately went to his car for waiver of rights and custodial statement forms. (427) Meanwhile, appellant was moved to McLeroy's outer office so that all three officers could observe his statement. (307, 377, 427) Roach filled out a waiver of rights form and read it to appellant. Appellant then read the waiver and signed it at 5:47 p. m. (SX 5, 1476; 308, 309; 377, 378; 428). Appellant was again asked if he wanted an attorney; he replied that he did not. (308, 453, 454).

After signing the waiver, appellant drew a rough diagram of the Phillips house. (SX 6, 1326; 310, 386, 430). Then appellant dictated his confession to Roach. (SX 7, 1348; 314, 379, 432). After the statement was typed, appellant read it, initialed some corrections, and signed it; the time was 7:22 p. m. (316, 380, 433). The entire statement, including the printed warning at the top of the first page, was read to appellant before he signed. (316, 380, 433)

McLeroy, Elliott, and Roach repeatedly testified that appellant never asked for an attorney and never asked that the interrogation be ended. Elliott and Roach testified that they did not interpret appellant's statement that he needed time to think as a request for all questioning to cease. (330, 452)

Appellant testified that after McLeroy explained the polygraph examination, he told McLeroy that he wanted a lawyer and would not take the test until he could talk to a lawyer. (464) He also testified that Elliott and Roach did not advise him of his rights and that he repeatedly asked that the questioning be stopped and an attorney appointed. (469, 470, 472, 476). Appellant was not able to recall clearly when he signed the two waivers, but admitted that the signatures were his. (474, 500, 502)

On cross-examination, appellant admitted that one reason he needed time to think was to give him time to decide who else to involve in the murder, but asserted that it was also to allow him to get legal counsel. (384) Appellant also admitted making the statement, "I can't talk about it, but I can write it down," and then making the first, handwritten statement. (495, 501) Appellant stated that he signed the formal confession only because he thought that "it was the only way to get out of there." (505, lines 24, 25)

*Tuesday, April 26, 1977*

Appellant was taken before Judge Cashell to receive his magistrate's warning with regard to the murder charge. Appellant did not request an attorney. (519)

*TIMETABLE FOR MONDAY AFTERNOON, APRIL 25, 1977*

2:00  McLeroy begins pre-test interview.

2:30  Appellant declines test, but agrees to talk; signs first waiver of rights.

3:00  Elliott begins first conversation, gives *Miranda* warning. Appellant says he needs time to "get things straight."

3:30  Roach begins first conversation; gives *Miranda* warnings.

4:00  McLeroy returns.

4:15  Elliott returns; appellant again says he needs time to think.

4:30  Roach returns with list of names; appellant says he can't talk, but he will write it out.

5:00  Appellant indicates he is ready to talk about the murder; is moved to outer office and again advised of rights.

5:47  Appellant signs second waiver of rights; begins confession.

7:22  Confession signed.