Glenn **ANDERSON & Charles Larry
Hunnicutt**, Appellants,

v.

The **STATE of Texas**, Appellee.

**Nos. 64108, 64110.**

Court of Criminal Appeals of Texas,
En Banc.

July 14, 1982.

Rehearing Denied Sept. 15, 1982.

Stephen L. Halsey, Dallas, for Anderson.

1. Appellants were separately indicted for the same offense and tried jointly. Art. 36.09, V.A.

Rod L. Poirot and Douglas R. Dunn, Dallas, for Hunnicutt.

Henry Wade, Dist. Atty. & Ronald D. Hinds, John Hubble, Brady Sparks & Rick Russell, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

OPINION

TOM G. DAVIS, Judge.

Appeals are taken from convictions for aggravated robbery.[1] Following pleas of guilty, the court assessed Anderson's punishment at 25 years and Hunnicutt's punishment at 20 years.

Both appellants raise the same single ground of error. They maintain that the trial court erred in overruling their special pleas of double jeopardy. Appellants contend that the instant prosecutions were barred because the first trial of these causes ended in mistrials due to prosecutorial overreaching.

The record reflects that appellants originally entered pleas of not guilty and a jury was picked on March 19, 1979. The jury was ordered to return for trial to commence the following day. The following morning, it was called to the attention of the court that one of the jurors, Leon Sampson, had a severe hearing problem which would impair his ability to serve as a juror. The State and appellants then agreed to the substitution of Cornelia Green for Sampson. This substitution never took place because the appellants refused to sign a document styled "WAIVER OF RIGHT TO MISTRIAL, MOTION FOR NEW TRIAL AND APPELLATE RIGHT TO CLAIM DOUBLE JEOPARDY ON GROUNDS OF JUROR SUBSTITUTION," which had been prepared by one of the prosecutors. In explaining why he felt that the appellants needed to sign the document, one of the prosecutors stated:

C.C.P.

"MR. RUSSELL: Judge, the problem is, if we go forward and hear the case without the previously sworn juror, I can envision a problem of jeopardy already. We know jeopardy has attached. There hasn't been any prejudice unless the twelfth substituted juror hears evidence instead of Mr. Sampson.

"If they won't waive their right to jeopardy, we can have three felonies blown out of the tub. I think we ought to go forward with Leon Sampson because I know damned well they are going to ascert (sic) it on appeal."

The court then questioned Sampson and learned that he was deaf in one ear and had only 30% hearing in the other ear. Sampson stated that he did not feel qualified to sit on the jury. The court then excused Sampson and proceeded to trial with eleven jurors.[2]

The first witness called by the State was the complainant, Oliver Anderson. The witness stated that on the evening of November 25, 1978, he was driving his car in Dallas. Anderson stopped the car at a red light and was approached by a woman who was standing on a street corner. Anderson testified that the next thing he knew, a knife had been placed at his throat.

The prosecutor then asked Anderson the following questions:

"Q. Mr. Anderson, are you scared and nervous of being here in the courtroom today?

"A. Yes, I am nervous.

"Q. In fact, did your wife receive a threatening phone call?"

After these questions were asked, the appellants made motions for a mistrial. Those motions were granted.

Prior to trial in the instant causes, the appellants filed special pleas of double jeopardy. They alleged that in fear of reversible error with regard to proceeding to trial with eleven jurors, the State had intentionally sought to have a mistrial declared in the first trial. It was therefore maintained that the first trial ended in a mistrial due to prosecutorial overreaching and that any subsequent prosecution was barred by jeopardy.

The court held a hearing on appellants' jeopardy motions. At the conclusion of that hearing, the motions were overruled and the court impliedly found that the asking of the question forming the basis of the mistrials constituted nothing more than prosecutorial error.

Rick Russell, Assistant District Attorney of Dallas County, testified that he was the lead prosecutor in the instant prosecutions. Russell stated that he was to handle the picking of the jury and final arguments in these cases. Assistant District Attorney John Hubble was assigned the duty of examining the witnesses in the cases. Russell stated that he and Hubble had discussed asking the complainant about the threats which his wife had received. In this regard, Russell stated as follows:

"Q. Now, did you tell him prior to that to ask that question?

"A. I did.

"Q. Did you tell him prior to that to ask that question in hopes that the Court would grant a mistrial?

"A. No, I thought the question was asked in good faith and I am still not certain of the law on it, although my understanding now is you must be able to connect the threat directly to the defendant. That was not my understanding prior to that. I had never had that situation come up before and if I had it to do over again, I suppose I would not do it.

"But the point is, it wasn't done intentionally, as your motion alleges, and I can assert that without qualification."

---

**2.** The excusing of a disabled juror pending trial and proceeding with eleven jurors is authorized by Art. 36.29, V.A.C.C.P. See *Allen v. State*, 536 S.W.2d 364; *Johnson v. State*, 525 S.W.2d 170. Art. 36.29, supra, provides in part:

"... when pending the trial of any felony case, one juror may die or be disabled from sitting at any time before the charge of the court is read to the jury, the remainder of the jury shall have the power to render the verdict; ..."

In describing his actions following the mistrials, Russell testified:

"A. I did apologize to the Court for the necessity of a declaration of a mistrial and stated that I instructed Mr. Hubble to ask the question. I also stated that I did not do it in bad faith and that I wasn't seeking an intentional mistrial. I think Judge Ryan will recall my apology to the Court for having caused the waste of time and the inconvenience. I didn't go back there and say, 'Oh, boy, we have got three mistrials. I am glad we did it right.' "

Prosecutor Hubble testified that in his opinion, the trial court had not erred in deciding to proceed to trial with eleven jurors. With regard to both the propriety of and the actual asking of the question forming the basis of the mistrial, Hubble testified:

"Q. . . .

"When had Mr. Russell suggested to you that question be asked?

"A. Well, we had discussed it due to Mr. Anderson's nervousness and his being very upset, that we felt that the question was a proper question to explain his nervousness and why he was upset and shakey in his voice, that he received a phone call prior to this trial. (sic)

". . .

"Q. All right. Did you and Mr. Russell discuss, in connection with the asking of that question, the possibility of an objection being made to that question?

"A. Well, no. We knew that the defense attorneys would not like the question and would obviously object.

"Q. Did you also know that?

"A. As far as an improper question, we didn't feel it was improper.

"Q. But you did feel like an objection would be made?

"A. Well, I feel that a lot of questions I ask witnesses, counsel is going to object."

In *Chvojka v. State*, 582 S.W.2d 828 (Tex. Cr.App.), the defendant contended that his second trial was barred by jeopardy. The defendant's first trial had ended following his motion for a mistrial. In stating the law applicable to such a situation, this Court held:

"Different considerations obtain, however, when the mistrial has been declared at the defendant's request. Where the circumstances which occasion a mistrial are not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial ordinarily is assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error. *United States v. Dinitz*, [424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) ]; *United States v. Jorn*, [400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) ]; *United States v. Crouch*, 566 F.2d 1311 (5th Cir. 1978); *United States v. Kessler*, 530 F.2d 1246 (5th Cir. 1976); *United States v. Beasley*, 479 F.2d 1124 (5th Cir. 1973). Prosecutorial overreaching will be found where the government, through 'gross negligence or intentional misconduct,' caused aggravated circumstances to develop which 'seriously prejudice[d] a defendant,' causing him to 'reasonably conclude that a continuation of the tainted proceedings would result in a conviction, *United States v. Dinitz*, supra, 424 U.S. at 608, 96 S.Ct. at 1080." *Chvojka v. State*, supra at 830 and 831.

In *Divans v. California*, 434 U.S. 1303, 98 S.Ct. 1, 54 L.Ed.2d 14 (1977), the applicant sought a stay of a second trial in state court. The stay was denied after it was noted that the state court had found that the prosecutorial error which formed the basis of the mistrial in the applicant's first trial was not the type of error which was committed for purposes of forcing the applicant to move for a mistrial. The Court went on to state:

"Any order granting a mistrial at the behest of a defendant in a criminal case is typically based upon error or misconduct on the part of other counsel or the court. In order to elevate such a typical order into one which could form the basis for a claim of double jeopardy, *it must be*

*shown not only that there was error, which is a common predicate to all such orders but that such error was committed by the prosecution or by the court for the purpose of forcing the defendant to move for a mistrial."* (Emphasis added).

In *United States v. Davis,* 589 F.2d 904 (5th Cir. 1979), the trial court found that the prosecutorial error which resulted in a mistrial was the result of inadvertence rather than bad faith. On appeal, the defendant's jeopardy claim was rejected after the Court noted that the trial court's finding would not be set aside unless it was shown to be clearly erroneous. Likewise, in *United States v. Crouch,* 566 F.2d 1311 (5th Cir. 1978), the defendant complained of the trial court's finding that his first trial ended as a result of prosecutorial error rather than prosecutorial misconduct. The Court rejected the defendant's contention after noting that: "Our review of this finding is limited by the provision of Fed.R.Civ.P. 52(a) which provides that *'findings of fact* shall not be set aside unless clearly erroneous.'" *United States v. Crouch,* supra at 1318 (Emphasis added).

In *Moroyoqui v. United States,* 570 F.2d 862 (9th Cir. 1977), the defendant's first trial ended in a mistrial due to improper questioning of a government witness by the prosecutor. Prior to the commencement of his second trial, the trial court held a hearing on the defendant's motion alleging that reprosecution was barred due to prosecutorial overreaching in his first trial. The motion was overruled after the trial court heard evidence from the prosecutor and various witnesses. On appeal, it was noted that the trial court was in the best position to weigh the testimony of the witnesses and evaluate their credibility. It was held that the trial court's order denying the defendant's motion would not be overturned unless it was clearly erroneous.

In *United States v. Nelson,* 582 F.2d 1246 (10th Cir. 1978) the defendant was tried for possession with intent to distribute cocaine. A mistrial was declared on the defendant's motion after a government witness on direct examination referred to the defendant as a "major trafficker." The defendant's plea of jeopardy was rejected by the trial court. The prosecutor stated that he knew in advance what the witness' characterization of the defendant would be; but, that in his opinion such testimony was supported by the evidence at trial. No error was found in the trial court concluding that the first trial ended as a result of mere prosecutorial error not intended to force the defendant to move for a mistrial.

Finally, in *Bell v. State,* 286 Md. 193, 406 A.2d 909 (1979), the defendant was convicted of having hired Ralph Mason to kill her husband. Mason was apprehended and agreed to testify against the defendant. At trial, Mason testified that the defendant's attorneys had threatened his life and the lives of members of his family if he did not refuse to testify and that he had been offered $5,000.00 to remain silent. After this testimony was given, the defendant's motion for mistrial was granted. Although it was later shown that the prosecutor knew of the allegations Mason would make against the defendant's attorneys, the defendant's jeopardy motion was overruled. The trial court found that the first trial had ended as a result of prosecutorial error and that the prosecutor had not deliberately sought a mistrial. On appeal, the Court refused to set aside the trial court's *factual conclusions* concerning the mistrial which were found not to be clearly erroneous. *Bell v. State,* supra 406 A.2d at 916.

■ We have previously held that the burden is on the defendant to go forth at his second trial with evidence in support of his allegation of former jeopardy. *Wockenfuss v. State,* 521 S.W.2d 630 (Tex.Cr.App.); *Ward v. State,* 520 S.W.2d 395 (Tex.Cr. App.). A plea of former jeopardy constitutes nothing more than a pleading and does not establish the truth of the issues of fact alleged therein. *Ray v. State,* 150 Tex. Cr.R. 80, 198 S.W.2d 906. In *Chadwick v. State,* 86 Tex.Cr.R. 269, 216 S.W. 397, it was held that when a defendant is not satisfied with the trial court's ruling upon the facts presented in support of his plea of former jeopardy, an appeal of such ruling may be

taken to this Court. Finally, when the record fails to contain the evidence offered in support of the plea of jeopardy, this Court is in no position to review a contention asserting that a trial court erred in overruling the plea. See *Dedmon v. State*, 478 S.W.2d 486 (Tex.Cr.App.).

In *Davidson v. State*, 40 Tex.Cr.R. 285, 49 S.W. 372, the Defendant was prosecuted for cattle theft. At trial, the defendant raised the issue of former jeopardy and testified that he had previously been convicted of the theft of a group of cattle. He maintained that the cattle, the subject of the instant prosecution, had been a part of the group of cattle for which he had previously been convicted of stealing. On appeal, the defendant's claim of jeopardy was rejected and the Court stated:

"... The evidence, as indicated above, does not show that the appellant's testimony is uncontradicted as to the cattle all being taken at one and the same time. It is true that no witness swears positively, as a fact, that they were not taken at one and the same time, yet all the witnesses, except the appellant, testify to circumstances that clearly indicate that they were not taken at one and the same time. The burden of proving the fact that they were taken at one and the same time is upon appellants, and the jury have decided the question against them, and we see no cause for disturbing their verdict." *Davidson v. State*, supra 49 S.W. at 373.

Likewise, in *Chvojka v. State*, supra, it was found that the trial court would have acted properly in overruling a special plea of jeopardy when the record was devoid of evidence that the prosecutor was guilty of any conduct which could be characterized as prosecutorial overreaching.

With regard to conflicts in the evidence and the resolution of factual questions, this Court has stated:

"It is to be remembered that the appellate court does not resolve the conflicts in the testimony such as those argued in the appellant's brief. The conflicts of the testimony are resolved by the trier of the facts. The trial court, as the trier of the facts, is the sole judge of the credibility of the witnesses and the weight to be given their testimony and may accept or reject all or any part of the witnesses' testimony...." *Guillory v. State*, 487 S.W.2d 327 (Tex.Cr.App.).

■ The pleas of double jeopardy filed by the appellants in the instant causes, allege that the State intended to cause a mistrial by asking the question which ultimately formed the basis of the mistrial. The pleas further alleged that "the [d]efendants' motion for mistrial was necessitated by the direct overreaching and unacceptable conduct of the prosecution...." These allegations were rejected by the trial court after it heard the evidence which the appellants had to offer in support of their pleas of double jeopardy.

There is no question but that the mistrials came about as a result of prosecutorial error. However, the evidence from Russell and Hubble clearly negate appellants' allegations of prosecutorial overreaching by means of intentional misconduct or gross negligence. The evidence supports the trial court's order overruling the appellants' pleas of jeopardy. Appellants' grounds of error are overruled.

The judgments are affirmed.

CLINTON, Judge, dissenting.

In the sole ground of error presented, complaint is made that the trial court erred in overruling each appellant's special plea of double jeopardy after their first trial, upon pleas of not guilty, ended in a mistrial prompted by a manifestly improper question asked by one of the prosecuting attorneys. Specifically, the contention is advanced that, because the mistrial was declared as a direct result of "prosecutorial overreaching," the Double Jeopardy Clauses[1] effectively barred any further prosecution of each appellant. After first setting

1. Fifth Amendment to the Constitution of the United States; Article I, Section 14, Bill of Rights in Constitution of the State of Texas.

the scene for the granted mistrial, for reasons then stated I am constrained to agree.

On the morning of March 19, 1979 the trial court[2] called three separately indicted but companion cases. Certain motions were heard and ruled on by the trial court. The court and counsel then conducted jury voir dire and twelve jurors were selected, impanelled and sworn; the jury was appropriately instructed and excused until 9:30 a. m. the following morning. One who thus became a juror was Mr. Leon Sampson.

Tuesday morning, March 20, outside the presence of the jury and initially *dehors* the record, but later as related by the trial court in the record, the following occurred:

"This morning at approximately 9:20, the Court in the presence of counsel for the State and counsel for the defendant [sic], was advised that Mr. Sampson's doctor had called the Court and his nurse had called the Court—that is the doctor's nurse—and his wife had called the Court to advise us that he had a very serious hearing problem and that Mr. Sampson— well, prior to Mr. Sampson's appearance, the Court discussed with counsel the alternative of proceeding with eleven and counsel for the defense refused to do that. Then it was agreed by and between counsel for the State, counsel for the defendants that they would substitute Cornelia A. Green who was a resident of Dallas County as the twelfth juror."[3]

After Green had been substituted for Sampson and may have retired unsworn to the jury room, the accused were arraigned. The trial court, observing that "it is a quarter after ten," then proceeded to hold an identification hearing. The complainant,

victim of the robbery, Oliver Anderson, was called by the State. He testified briefly concerning the events leading up to the offense, made an in-court identification of each accused as he described the particular acts of each. There was no objection to any question to, or answer given by, Anderson. Cross-examination was watchfully limited by the trial court to the matter of identification, sometimes upon objection by the State; three such objections were made. Redirect by the State consisted of getting two answers for clarification of his testimony on one point.[4] The trial court overruled objection to identification testimony and then declared a ten minute recess, asking to be reminded upon reconvening that there was one juror "that I have to administer the oath to," meaning, no doubt, Green.

When court reconvened the trial court took up the matter of Sampson's being excused and Green's substitution for him and, after reciting for the record that which we have set forth verbatim *ante*, carefully ascertained from each counsel and accused personally that the stipulation for substitution was "still in agreement." But, as we shall see, this agreement by the defense did not allay some not yet fully apparent misgiving on the part of the prosecution.

For at this juncture assistant district attorney Russell produced a handwritten waiver and requested the accused and their lawyers "to sign this if it is in keeping with their expectations." This paper is styled "Waiver of Right to Mistrial, Motion for New Trial and Appellate Right to Claim Double Jeopardy on Grounds of Juror Substitution" and its provisions are reproduced in the margin.[5] The prosecutor then an-

2. The trial court was presided over by a "visiting" trial judge pursuant to proper administrative assignment.

3. The State was initially represented by two assistant district attorneys: Rick Russell, who later characterized himself as "the senior counsel in this case," and John Hubble, "a new prosecutor," who actually entered into this agreement which Russell said was made "out of my presence."

4. It is pertinent to observe that nothing otherwise remarkable or untoward occurred during the course of the testimony of Anderson, which consumes some thirty five pages of the record, for I shall advert to the point presently.

5. "Now comes the Defendants in the above styled and numbered causes by and through their attorneys of record and respectfully prays this Honorable Court to permit the substitution of alternate, unsworn juror Cornelia Green for previously selected and sworn juror Leon Sampson inasmuch as it

nounced to the trial court that unless all attorneys and all accused signed this purported "waiver," the State did not want to proceed with a substitute juror, noting that "it is a ticklish point because that juror [Sampson] had been sworn and jeopardy has attached." After defense counsel stated their collective unwillingness to sign such a waiver, as expressed in the *second* paragraph,[6] and the trial judge received negative responses from his inquiry whether anyone moved for a mistrial, Russell revealed his own thoughts on the matter:

"... the problem is, if we go forward and hear the case without the previously sworn juror, I can envision a problem of jeopardy already. We know jeopardy has attached. There hasn't been any prejudice unless the twelfth substituted juror hears evidence instead of Mr. Sampson. "If they [the defendants] won't waive their rights to jeopardy, we can have three felonies blown out of the tub. I think we ought to go forward with Leon Sampson because I know damned well they are going to ascert [sic] it on appeal."

After one defense counsel pointed out that a substitution of jurors was the agreement, the same prosecutor continued to voice his fear that the record in its present state contained reversible error:

"Well, we have checked the law and I have checked with the Appellate Section and the only problem that exists is a problem of double jeopardy.
"I don't want to be bullied into accepting a position that the Appellate Section has told me is not right. If I can't get an agreement, we will go with Mr. Sampson."

Defense counsel objected to the State's refusal to fulfill the agreement to proceed with a substitute juror, and Russell, expressly exercising his "senior counsel" status, retorted, "we abrogate any such agreement at this time." Hubble said "for the record" that the agreement he had made was "a non-final agreement." Russell requested a recess to research the law "in full" because "as I read the law right now, I think we have got a double jeopardy problem." At 11:30 a. m. the court excused the jurors until 12:45 p. m. After lunch, the State opined that there was no authority for Green to become a juror, opted to proceed with Sampson or the remaining eleven jurors, later explaining:

"Well, the reason we abrogated the agreement is that we stand to lose either way. You get a not guilty with a new juror or you raise double jeopardy on appeal because the old juror was excused. If you will waive double jeopardy, we will have an agreement."

The trial court decided to hold a hearing on the question of juror Sampson's ability to "continue" as a juror and spread upon the record the facts concerning his hearing disability. During this hearing, Sampson testified that he attempted to bring his hearing problem to the attention of the trial court during the voir dire examination but that he was dissuaded from doing so by the court bailiff who told him that "he was too far along in the numbers" and would not therefore have to serve on the jury. At the conclusion of the hearing, the court found that Sampson was disabled as a juror under the provisions of Article 36.29, V.A.C. C.P. and over defense objections, ordered the cause to proceed to trial with eleven jurors.

has become known to all parties that the said Leon Sampson suffers a profound hearing disability and cannot adequately serve on this jury and accord the Defendants a fair trial as a juror of their peers.
"The Defendants respectively waive, knowingly, voluntarily, and intelligently as well as upon advice of counsel any rights they might otherwise have to assert complaining against [sic] said juror substitution including or the impanelling [sic] of a prejudicial juror to the Defense. Defendants waive motions for a

mistrial and for a new trial on grounds of mis-impanelling of the said juror Cornelia Green.
"Defendants request impanelling of Cornelia Green at this time, prior to the release of Leon Sampson as a juror."

**6.** As originally drafted the second paragraph mentioned also claims or grounds of double jeopardy; in an effort to resolve the problem the trial judge offered to and did strike out references in the text to double jeopardy.

On the afternoon of the same day, the eleven jurors were returned to the courtroom where the three defendants entered pleas of not guilty.

As its first witness the State called the complainant, Oliver Anderson. This time the same assistant district attorney who had questioned him earlier in the identification hearing adduced considerable personal data.[7] Anderson began testifying about a conversation he had with one of two female pedestrians while stopped at a red light on the corner of Second and Metropolitan, identified her as she sat in court, and then told of having had a knife placed to his neck by someone. After a pocket knife was marked as State's Exhibit 1, the following immediately occurred:

Q [By the prosecutor]: Mr. Anderson, are you scared and nervous of being here in the courtroom today?

A: Yes, I am nervous.

Q: *In fact, did your wife receive a threatening phone call?*[8]

Objections were promptly made "to any hearsay of any type like that" and "to Mr. Hubble testifying concerning any phone calls and leading the witness" and, again, to hearsay statements. The trial court sustained the defense objections, instructed the jury to disregard and pursuant to respective motions by each accused granted a mistrial as to all three defendants. Neither prosecuting attorney attempted to protest; to the contrary, when the obviously exasperated trial judge stated for the record that each defendant had made a motion "for an instructed verdict," Russell asked only, "Judge, would that be a motion for a mis-

trial?" and the trial judge corrected himself, announcing that he wanted to see the lawyers in chambers after the jury had been discharged.

The following day, prior to a new trial on the merits, a hearing was conducted on the Defendants' Special Plea of Double Jeopardy. In support of their special plea, the appellants first called Russell. Russell stated that although he was not certain that the proceedings regarding Sampson and Green constituted jeopardy error, he wanted to guarantee against it by having the defendants sign the waiver alluded to above.[9] Russell admitted to having told Hubble to ask Anderson about his wife's receiving a threatening phone call. Though he denied bad faith,[10] Russell conceded that to properly preserve his appellate record, a defense attorney must pursue objections to an adverse ruling, i.e., if an objection is sustained, a curative instruction must be sought and, if given, a motion for a mistrial must be made or nothing will be preserved for review. See, e.g., *Cain v. State*, 549 S.W.2d 707 (Tex.Cr.App.1977); *Broussard v. State*, 505 S.W.2d 282 (Tex.Cr.App.1974); *Gleffe v. State*, 509 S.W.2d 323 (Tex.Cr. App.1974). Russell again denied having "set-up" the accused to move for a mistrial because of the question, but the following explanation is revealing:

Q [By defense counsel]: Now, did that, [the mistrial] in your mind, solve the problem you might have had earlier in the jury impanelment?

A [By Mr. Russell]: I was chastised by the chief prosecutor of the Court for not having known better than to ask the

---

7. Thus, the jury learned that Anderson was then fifty-six years of age, married with two preteen children, lived in the Pleasant Grove community in southeast Dallas, employed by Braniff Airways as an aircraft engine parts cleaner for sixteen years, had a cousin in South Dallas from whose home he had just departed, stopped and bought cigarettes and beer and was then alone in his car on his way to his own residence when the first incident leading to the offense at trial transpired.

8. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

9. In his testimony Russell took the somewhat flexible position that *his* "understanding" of the agreement *Hubble* entered into was "that the right of double jeopardy would be waived on the part of the defense," but that Hubble "did not have the authority to make such an agreement."

10. Russell "thought the question was asked in good faith and I am still *not certain of the law* on it." He has been practicing as a prosecutor and an attorney since October 1975.

question. *The collateral effect was if there was a double jeopardy point, it might have been cleared up . . .*

Secondarily, *to be honest,* I thought, well, *I guess if there was anything good that was coming from this, if there was a double jeopardy point, it had been waived at this point* [sic].

Appellants then sought to call Hubble, only to be informed that "[h]e is not in the office this morning." After a recess, Hubble appeared for questioning.[11] Hubble was unclear but acknowledged that he and Russell had discussed putting the complained of question to Anderson.[12] The prosecutor testified that he and Russell felt "that the question was a proper question to explain his [the complainant's] nervousness and why he was upset and shakey in his voice [sic]." The prosecutor conceded that the question was leading and, as he stated, "*we knew that the defense attorneys would not like the question and would obviously object.*" Hubble admitted that the question contained hearsay statements, yet insisted it was not improper, pointing out that "*if the attorney objects to it* [hearsay] from the defense side, it is objectionable." On cross examination, Hubble denied that the question was asked in bad faith. Following arguments by counsel, the trial court overruled the defendants' special plea, the defendants withdrew their pleas of not guilty, entered pleas of guilty and were adjudged to be guilty and sentenced to confinement as noted above pursuant to such pleas. Leave to appeal was granted by the trial court. Art. 44.02, V.A.C.C.P.

The thrust of the contention here advanced by appellants is that the prosecutors in the instant case, believing that reversible error had already crept into the record, decided to abort the proceedings by asking a manifestly improper question knowing full well that the defense attorneys would have to continue with a prejudiced jury or ask for a mistrial then, if not to fully abort the trial, to protect the appellate record. The State counters that there was no potential error extant at the time the mistrial was granted and, even if there were, "there is no showing in this record that it was either motivated by bad faith or undertaken to harass or prejudice" these appellants. The State in so contending even goes so far as to argue that the trial court's prompt instruction cured the error and the trial court therefore need not have declared the mistrial.[13]

The claim should not detain us long for an even cursory examination of the authorities attests to the manifest prejudice flowing from the question. *Benavides v. State,* 111 Tex.Cr.R. 361, 12 S.W.2d 1031 (1929): "highly improper" to ask if accused prevailed on State's witnesses to remain away from court; *Lackey v. State,* 148 Tex.Cr.R. 623, 190 S.W.2d 364 (1945) and cases cited therein; *Vick v. State,* 71 Tex.Cr.R. 50, 159 S.W. 50, 57 (1913).

The ultimate issue before this Court is whether, by deliberately asking the question forming the basis for the mistrial, the prosecutors *intended to provoke* the accused

---

**11.** During a dialogue as to what Hubble could contribute Russell observed, "I don't think he could add any rationale for the asking of the question beyond the fact that I asked him and instructed him to do it."

**12.** Hubble says the discussion was "due to Mr. Anderson's nervousness and his being very upset" because "*he* received a phone call prior to his trial." The record does not otherwise inform us when the phone call was received, but Hubble recalls the discussion occurred "prior to when we started," which we take to mean before Anderson testified to the jury, for, as we discerned *ante,* during the identification hearing Anderson manifested no nervousness or upset condition such that corrective or explan-

atory action was deemed advisable by the prosecutors.

**13.** On the point, however, the trial court was adamant. During the hearing on appellant's special plea the court admonished:

"Whether we had just started without problems with the jury selection, under the same question and the same motion, the Court would have granted the motion for a mistrial. * * * If that question is asked today and you move for a mistrial, it will be granted, and if it is asked next week in a different case, different circumstances with the same question and the motion, it will be granted."

into requesting that result. *Oregon v. Kennedy,* — U.S. —, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).[14]

The circumscription of this issue is derived from pronouncements of the Supreme Court of the United States; in *Oregon v. Kennedy,* supra, at —, 102 S.Ct. at 2088 that Court explained,

> "Since one of the principal threads making up the protection embodied in the Double Jeopardy Clause is the right of the defendant to have his trial completed before the first jury impanelled to try him, it may be wondered ... why the defendant's election to terminate the first trial by his own motion should not be deemed a renunciation of that right for all purposes. We have recognized, however, that there would be great difficulty in applying such a rule where the *prosecutor's actions giving rise to the motion for mistrial were done 'in order to goad the [defendant]* into requesting a mistrial [and thereby (subject a) defendant to the substantial burdens imposed by multiple prosecutions.]'* United States v. Dinitz* [424 U.S. 600, 611, 96 S.Ct. 1075 [1081] 47 L.Ed.2d 267 (1976) ]."

Cf. *United States v. Tateo,* 377 U.S. 463, 468, n. 3, 84 S.Ct. 1587, 1590 n.3, 12 L.Ed.2d 448 (1964) [where, in rejecting a jeopardy claim, the Court observed, "If there were any intimation in a case that prosecutorial ... impropriety justifying a mistrial resulted from a fear that the jury was likely to acquit the accused, different considerations would, of course, obtain"].

In distilling the criterion to be applied in cases such as this, the Supreme Court acknowledged "the confusion" wrought by its opinions on the subject and determined that "[p]rosecutorial conduct that might be

viewed as harassment or [exhibiting *bad faith* ], even if sufficient to justify a mistrial on defendant's motion, therefore, *does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded* by the Double Jeopardy Clause." — U.S. at —, 102 S.Ct. at 2089.

Having delineated the standard, the Court offered guidance for applying the facts of a case to it:

> " ... [A] standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. *It merely calls for the court to make a finding of fact.* Inferring the existence or nonexistence of intent from *objective facts and circumstances* is a familiar process...." [15]

— U.S. at —, 102 S.Ct. at 2089.

The State here urges this Court to find that the mistrial came about because "the young and inexperienced prosecutor, in his zeal to follow *the game plan,* blurted out a confused and inappropriate version of *the prearranged question.*" This I would not do, for:

> " ... A State falls short of its obligation when it ... prevents a trial from proceeding to a determination ... merely in order to allow a prosecutor who has been *incompetent or casual or even ineffective* to see if he cannot do better a second time."

*Brock v. North Carolina,* 344 U.S. 424, 429, 73 S.Ct. 349, 351, 97 L.Ed.2d 456 (1953) (Frankfurter, J., concurring).

Moreover, the totality of the circumstances shown here reveals otherwise. Though both prosecutors disclaimed "bad faith," the

**14.** " ... [We hold] that the circumstances under which a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the *conduct* giving rise to the successful motion for mistrial *was intended to provoke* the defendant into moving for a mistrial."
— U.S. at —, 102 S.Ct. at 2091.

**15.** "Because 'subjective' intent often may be unknowable, I emphasize that a court—in considering a double jeopardy motion—

should rely primarily upon the objective facts and circumstances of the particular case."
— U.S. at —, 102 S.Ct. at 2092. (Powell, J., concurring.)
"Deliberate misconduct generally must be inferred from objective evidence. The more egregious the prosecutorial error, and the harsher its impact on the defendant, the more readily the inference could be drawn."
— U.S. at —, n. 29, 102 S.Ct. at 2097, n. 29. (Stevens, J., concurring in judgment.)

record facially reflects they were quite troubled by what they believed was a juror substitution problem. The attempt to persuade appellants to sign a "waiver" of their right to assert the juror substitution issue on appeal; the concern that the prosecutors showed after appellants refused to sign the waiver vis a vis the odds for a reversal on appeal; the desperate "abrogation" of the agreement to proceed with a substituted juror; and, significantly, the studied resolve to propound the question, then lack of protest to the motions for mistrial—all are *objective* facts and circumstances from which the existence of the prosecutor's intent in positing the objectionable question is clearly inferable: viewed in context, I am satisfied that the question asked resulted from something more than mere negligence on the part of an inexperienced prosecutor. Indeed, the most damaging evidence is the fact that each prosecutor, though professing to believe it not improper, knew that the question was objectionable and practically anticipated the very objections that were in fact made prior to asking. Once the question had been asked, it was incumbent upon each defense attorney to object, ask for a curative instruction, and move for a mistrial to protect their clients' rights, something of which each prosecutor was acutely cognizant. The favorable "collateral effect" of the mistrial was recognized by "senior counsel."

We are not faced with a situation where a State's witness is asked a question which on its face is perfectly legitimate yet, through no fault of the prosecutor, blurts out a manifestly improper answer which could not have been anticipated. Rather, we confront prosecutors who *themselves* gratuitously interject the rankest of hearsay [16]—suggesting (in the absence of available proof) [17] that the accused have caused a threat to be made against the complainant's spouse—into a trial *they* fear is already contaminated with reversible error. [18]

Even before the Supreme Court decided *Oregon v. Kennedy*, supra, there was a growing body of authority in support of the proposition that deliberate and intentional misconduct which compels the accused to move for a mistrial so violates the protective policy of the constitutional guarantee against being twice placed in jeopardy that retrial is barred. *Muller v. State*, 478 P.2d 822 (Alaska 1971); *Commonwealth v. Wright*, 439 Pa. 198, 266 A.2d 651 (1970); *Commonwealth v. Warfield*, 424 Pa. 555, 227 A.2d 177 (1967); *United States ex rel. Montgomery v. Brierley*, 414 F.2d 552 (3rd Cir. 1969), *cert. denied*, 399 U.S. 912, 90 S.Ct. 2206, 26 L.Ed.2d 566 (1970); see also Note, Double Jeopardy: The Reprosecution Problem, 77 Harv.L.Rev. 1272 (1964).

The highest tribunal of a sister state has spoken to the issue before us and its treatment is instructive:

"Instances of deliberate prosecutorial misconduct are particularly subject to scrutiny. Oppression will be most acute

---

**16.** Here, the utterly inadmissible content of the prosecutor's question—even if it had been elicited from the witness—clearly renders *Bell v. State*, 286 Md. 193, 406 A.2d 909 (1979), cited by the majority, inapposite. Compare also the facts of *Oregon v. Kennedy*, supra:

"The gist of *the [prosecutor's] comment* that [Kennedy] was a 'crook' *could fairly have been elicited from the witness*, since defense counsel injected the [accused's] past alleged improprieties into the trial by questioning the witness about his [having filed a complaint against the] defendant. The comment therefore could not have injected the kind of prejudice that would render unmeaningful the defendant's option to proceed with the trial."
—— U.S. at ——, 102 S.Ct. at 2098. (Stevens, J., concurring).

**17.** Of course, the absence of supporting proof of the prosecutor's bald assertion, (made apparent by the State's lack of protest to the mistrial) is the crucial distinction between the instant case and *United States v. Nelson*, 582 F.2d 1246 (10 Cir. 1978), relied upon by the majority.

**18.** The prosecutor's fear in this regard, expressed repeatedly throughout the record before us, is in stark contrast to the "objective facts and circumstances" extant in *Oregon v. Kennedy*, supra:

"The isolated prosecutorial error occurred early in the trial, too early to determine whether the case was going badly for the prosecution."
—— U.S. at ——, 102 S.Ct. at 2098 (Stevens, J., concurring).

where a prosecutor deliberately precipitates a mistrial in a case which is going badly in order to allow himself, at a later time, either to present a better case or simply to harass the defendant with another prosecution."

*Muller v. State*, supra, at 827.

The majority glosses over the trial court's failure to make any finding of fact and attributes to the denial of appellant's plea in jeopardy, an "implied finding" that the bases of the mistrials was "nothing more than prosecutorial error," then summarizes and cites a number of federal decisions for the proposition that a finding made by a federal district court will not be set aside unless "clearly erroneous." But, of course, the "clearly erroneous" standard is, as *United States v. Crouch*, 566 F.2d 1311, 1318 (5 Cir. 1978), itself points out, provided by Federal Rules of Civil Procedure, Rule 52(a).[19] It is enough to say that in reviewing rulings of our own state trial courts this Court has never held itself governed by Rule 52(a), supra, or any other federal rule of procedure[20]—as the majority's failure to cite a case of our own as authority well attests.

But if the federal standard urged by the majority did apply, a prerequisite to its application, also mandated by Rule 52(a), supra, is that the trial court "*shall* find facts specially and state separately its conclusions of law thereon." Where the trial court fails to make findings altogether—as in the instant case—the federal appellate courts "normally vacate the judgment and remand the action for appropriate findings to be made." 5A Moore's Federal Practice,

§ 52.06(2) at 2718 and cases cited in n. 1 (2nd ed. 1982); yet the majority does not adopt Rule 52(a) to this extent, though abatement for findings would not be an inappropriate action under Texas law, cf. *McKittrick v. State*, 535 S.W.2d 873 (Tex. Cr.App.1976), and would surely be a more judicious result in the instant case than a flat refusal to review the issue.

Even if I could agree that this Court is in a position to presume an "implied finding," I am at a loss as to how the majority reached the determination that what it cites as a "finding of fact" is not instead a "conclusion of law," terminative of the ultimate issue in the case, *viz*: "the asking of the question forming the basis of the mistrials constituted nothing more than prosecutorial error." I am also perplexed by the majority's discussion of precepts such as the burden of proof being on appellants, the failure to carry that burden where the record is "devoid of evidence," and the rule to be applied where there are conflicts of evidence. While everything the majority opinion states is true, the reader is not informed of how these well settled propositions are being applied in the instant case. Apparently the majority has also presumed that the trial court considered nothing other than testimony of the prosecutors adduced upon the plea in jeopardy to the effect that it was not their intent to cause a mistrial, then views the failure of appellants to present other witnesses as a failure to contradict the State's position and perforce, a failure to carry their burden of proof. I could not disagree that the expressions of

---

**19.** It is noted, however, that *Crouch*, supra, was readdressed by the Fifth Circuit on remand from the Supreme Court in light of its holding in *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) that pretrial denial of a double jeopardy claim is an appealable order subject to *plenary review* by a federal appellate court. See *Crouch v. United States*, 432 U.S. 903, 97 S.Ct. 2945, 53 L.Ed.2d 1075 (1977). *United States v. Davis*, 589 F.2d 904 (5 Cir. 1979), while considered on direct appeal after conviction, cites and follows *Crouch*.

**20.** It is nevertheless interesting to note that the Fifth Circuit has not deemed itself invariably bound by the "clearly erroneous" test in exam-

ining jeopardy claims. See, e.g., *United States v. Kessler*, 530 F.2d 1246, 1256 (1976):

"Thus a *stringent analysis* of the prosecutor's conduct, considering *the totality of the circumstances* prior to the mistrial, . . . is our inquiry."

And the Supreme Court of the United States has characterized its duty in such cases as, "to make its own *independent examination* of the record," based on the "principle that the duty rests on this Court to decide for itself facts and constructions upon which federal constitutional issues rest." *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

lack of intent by Russell and Hubble "clearly negate appellants' allegations" if those expressions were the only relevant evidence contained in the entire record before us; but of course, they are not.[21] Indeed, if the majority is correct in presuming that such expressions were the only evidence considered by the trial court, then that alone would be justification for abating this cause for findings to be made upon the correct standard, i.e., the *objective* facts and circumstances. *Oregon v. Kennedy,* supra.

In sum, it seems hollow for this Court to cite *Chadwick v. State,* 86 Tex.Cr.R. 269, 216 S.W. 397 (1919), for the proposition that claims such as these will be reviewed on appeal[22] then wholly defer to a trial court's ruling which is unreviewable. To the majority's refusal to at least require the trial court to express the factual bases for its rejection of appellants' plea in jeopardy, consonant with the correct constitutional standard,[23] I respectfully dissent.

ROBERTS and TEAGUE, JJ., join.

---

21. Even in *Oregon v. Kennedy,* supra, where the prosecutor's conduct arguably should not have precipitated a mistrial at all, Justice Powell added:

"Nevertheless, this would have been a close case for me if there [had] been substantial factual evidence of intent beyond the question itself."

—— U.S. at ——, 102 S.Ct. at 2092.

22. It should be noted, however, that *Chadwick,* supra, is not appropriately cited here, for it deals with a plea in jeopardy advanced after the trial court *sua sponte* aborted a trial over the objection of the defendant.

The Supreme Court has observed that in such a case, the deference to be accorded an exercise of broad discretion by a trial court in deciding whether "manifest necessity" justifies discharge of a jury, is in contrast to "the *strictest scrutiny* [to be applied] when ... there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused."

*Arizona v. Washington,* 434 U.S. 497, 508–509, 98 S.Ct. 824, 831–832, 54 L.Ed.2d 717 (1978).

23. For an example of how this Court treats questions of constitutional law which are *expressly* resolved by the trial court on an incorrect constitutional standard, see *Faulder v. State,* 611 S.W.2d 630 (Tex.Cr.App.1979) (Opinion on State's Second Motion for Rehearing), *cert. denied,* 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 95 (1979).